## TARGET STORES, INC. v. TWIN PLAZA COMPANY.

153 N. W. (2d) 832.

September 1, 1967—Nos. 40,136, 40,274.

*Nilva, Shaw & Frisch, Gordon Rosenmeier,* and *John E. Simonett,* for appellant.

*Faegre & Benson, Robert J. Christianson, Armin M. Johnson,* and *Lawrence C. Brown,* for respondent.

SHERAN, JUSTICE.

Appeal from an order of the district court denying defendant's motion for amended findings of fact and conclusions of law or, in the alternative, for a new trial, and from the judgment entered thereafter.

On June 22, 1961, Twin Plaza Company was the owner of a 23-acre tract of land near the intersection of Rice and Montana Streets in the city of St. Paul. Efforts to develop this site as a mercantile shopping center occurring before and after that date brought about litigation between plaintiff Target Stores, Inc., standing in the shoes of the buyer, and defendant Twin Plaza Company, the seller, raising the question of whether an agreement to purchase the realty made on that date constitutes a specifically enforceable contract and, if not, whether either of the parties is entitled to other relief because of the events which followed the execution of said agreement.

On June 22, 1961, an agreement to purchase the 23 acres was executed. By its terms, the seller agreed to deliver (in the future) a warranty deed conveying marketable title to the premises, subject only to this relevant exception:

"(e) Rights of tenants as follows: (unless specified, not subject to tenancies)."

No tenancies were specified.

In addition, the agreement contained this representation:

"Seller represents that entire parcel is zoned commercial and is free of restrictions on use thereof, except those restrictions referred to and noted in the legal descriptions herein."

No restrictions now significant were noted in the purchase agreement.

The seller made available to the buyer a certificate of title and registered property abstract for examination. Certain defects in proceedings involving the vacation of streets and alleys which affected the title adversely were noted by the buyer's attorney on July 28, 1961. It was not until September 21, 1961, that these defects were corrected to the buyer's satisfaction.

While these additional steps were being taken, a supplemental agreement dated August 28, 1961, was entered which recognized postponement of the closing date as provided in the June 22 contract and provided:

"WHEREAS, the Buyer desires to enter into possession of said lands under said purchase agreement for the purpose of commencing improvements incident to the construction of a building thereon,

"Now THEREFORE, * * * in consideration of the sum of Five Hundred Dollars ($500) * * * said purchase agreement * * * is * * * amended * * * by the inclusion of the following provision:

" 'Seller agrees that pending the correction of the title, Buyer may enter into possession of said land and make improvements thereon limited to the preparation and development of the land as a building site including soil testing, excavating, and filling, but not to include the construction of any buildings thereon; and Seller agrees that if for any reason the purchase agreement is not consummated by payment of the purchase price by the Buyer and delivery of the deed by the Seller, Buyer shall not be liable to Seller for damages or otherwise on account of any work done on the premises pursuant to the possession granted under this agreement, except that Buyer agrees to indemnify and hold Seller harmless from any mechanics' or materialmen's liens arising out of said improvements or construction.' "

Following execution of this agreement, expenses of about $75,000 were incurred by the buyer in anticipation of transfer to it of a marketable title to the premises. This work commenced about September 11, 1961, and continued until about the middle of October.

In early October, the buyer became aware that there were in existence four agreements executed during the period from 1956 to 1958 in con-

nection with a shopping center, the plans for which failed to materialize. Its attorney considered that these agreements created interests in third persons making the seller's title unmarketable. So informed, the seller's position was that the agreements did not adversely affect its title but that it would nevertheless secure releases of any claims assertable under the agreements in question. While this effort was being made, the buyer— as a result of negotiations which began in November and culminated in December—secured an alternate site for the purpose intended. On February 23, 1962, at a time when the seller had secured a release of only one of the four agreements which caused the difficulty, the buyer rescinded the purchase agreement of June 22 upon the ground that the title had not been made marketable and demanded the return of the $13,750 downpayment and recompense for the expense incurred in preparing the land for its use.[1]

---

[1] The letter reads in part: "On or about October 6, 1961, * * * the undersigned first received notice of * * * at least four leases of long duration with respect to portions of the real estate which was the subject matter of such Purchase Agreement. * * * [T]he undersigned received notice thereof only by reason of communication to them by the lessee of one of the leases and by reason of inquiry made of you by the undersigned on or about October 6, 1961 regarding leases upon said real estate, which inquiry was prompted in part by said communication and in part by contemporaneous statements of your representative. * * *

"On or about October 6, 1961 you were advised by the attorneys for the undersigned that the existence of these leases rendered title to the land referred to in said Purchase Agreement unmarketable since the Purchase Agreement contained a representation by you that said land was not subject to tenancies.

"On October 13, 1961 your attorneys by letter addressed to the attorneys for the undersigned acknowledged the existence of these leases and stated that your attorneys had decided to contact lessees thereunder for the purpose of obtaining mutual releases of their respective leases. * * *

"As heretofore stated, the existence of any one or more of these leases renders title to the real estate in question unmarketable. Further, your inability to obtain the surrender and release of all these leases prior to this date constitutes such a delay in bringing about marketability of the title to said real estate as to render the Purchase Agreement as so amended void.

By May 8, 1962, the seller had secured releases of all four of the agreements. It tendered performance. The tender was refused. Then, on May 24, 1962, the seller served notice of cancellation of the June 22, 1961, purchase agreement pursuant to Minn. St. 559.21.

An action was instituted by the buyer to recover sums paid by it under the June 22 agreement and the August 28 supplemental agreement and to secure compensation for the expense incurred in improving the property. The seller counterclaimed for specific performance. The trial judge, who heard the case without a jury, decided in plaintiff's favor. Essential to the decision embodied in its findings of fact, conclusions of law, and incorporated memorandum are these propositions:

(1) The agreements disclosed in early October 1961 were leases or specifically enforceable agreements to lease which created adverse interests in the land covered by the June 22 agreement.

(2) The June 22 agreement contains affirmative representations that no such adverse interests were then in existence. In addition, the failure of the seller to disclose the existence of the agreements was equivalent to an affirmative representation that no such interests were outstanding.

---

As a consequence the undersigned, and each of them, hereby notify you of the election of the undersigned, and each of them, to treat the Purchase Agreement as so amended as void and no longer binding or obligatory upon the undersigned or any of them.

"The undersigned, and each of them, hereby demand that you forthwith refund to said Target Stores, Inc. the $13,750 earnest money payment heretofore received by you under such Purchase Agreement.

"*In reliance upon the representation in said Purchase Agreement that the real estate therein described was not subject to any tenancies,* the undersigned in pursuance of the amendment of the Purchase Agreement effected by said Agreement dated August 28, 1961 went into possession of portions of such real estate and expended sums in testing, exploring and improving such real estate. The total amount thus expended was $75,872. * * *

"The undersigned, and each of them, do hereby surrender to you any possession or right to possession of said real estate which they or any of them may have heretofore had under the term of said Purchase Agreement as so amended or otherwise." (Italics supplied.)

(3) These representations were material and fraudulent.

(4) The buyer, acting reasonably on these representations, was entitled not only to rescind the June 22 agreement and recover the money it had paid, but also to recover the damage proximately caused by its reliance on the fraudulent assertions.

(5) There was no waiver of the right to rescind and the act of rescission did not abate the buyer's right to recover the damages attributable to the fraud.

The seller's post-trial motion for amended findings and conclusions or, alternately, for a new trial was denied, and so this appeal.

As will be evident from this summary of the facts, the case, in its present posture, turns on the significance to be given to the agreements made between the seller and third persons, which agreements were outstanding when the buyer rescinded. This is so because the trial judge found the failure to disclose these agreements—and affirmative representation that no such agreements existed—to be the fraud for which consequential damages were allowable.

## The 1956–1958 Agreements

The matters as to which the misrepresentation allegedly occurred in this case were three instruments each entered into by defendant and a different retailing concern.[2] Each is quite comprehensive in treating the matters normally included in leases.

A. *Red Owl.*

One such instrument, denominated a "lease," was made with Red Owl Stores, Inc., on December 4, 1956.

*1. Premises.*

(a) *Description.* It stated that the lessor "does hereby demise and lease unto the Lessee, and Lessee hereby hires and takes from the Lessor," property described as:

"The area designated as 'Space No. 1' and outlined in red on the plat

---

[2] A fourth agreement with Sinclair Refining Company will not be considered here because it was terminated on January 22, 1962, prior to plaintiff's February 23, 1962, rescission.

plan which is attached hereto, marked 'Exhibit A', said premises consisting of a one-story building of approximately sixteen thousand eight hundred (16,800) square feet of ground floor space, *to be constructed by Lessor according to plans and specifications prepared by Lessor and approved by Lessee."* (Italics supplied.)

(b) *Duty to Construct.* Another portion of the document provided:

"The Lessor shall construct upon the demised premises a building and other improvements, the same to be in accordance with the plans, marked 'Exhibit A', and the specifications marked 'Exhibit B', *which shall be prepared by the Lessor, approved by both parties,* and incorporated into this Lease as exhibits, and made a part hereof." (Italics supplied.)

*2. Term.*

The term of the lease was described as—

"* * * ten (10) years, beginning on the date that the building to be erected for the Lessee by Lessor upon said premises has been completed and Lessor has completed buildings and *performed other conditions relating to the development of the Twin Plaza Shopping Center, of which the demised premises are a part,* as hereinafter provided." (Italics supplied.)

In addition, the lessee was given the privilege to renew for two successive 5-year periods. A specified rent was to be paid "during the term."

*3. Right to Terminate; Exculpatory Clause.*

The document further provided:

"It is agreed that *Lessor shall execute leases with and complete buildings for at least seven (7) other bona fide tenants in the shopping center,* and that the tenants for said other seven leases shall include [named retail concerns] or similar. *It is agreed that no rental shall accrue hereunder and the term of this lease shall not commence* until the Lessor has complied with the foregoing conditions, and the *Lessee shall have the option of terminating this Lease unless leases for the foregoing have been executed and construction commenced by Sept. 1, 1957.* It is

further understood and agreed that if the demised premises are not ready for occupancy before March 1, 1958, then the *Lessee* shall have the *option* to terminate this Lease, and neither party shall thereafter have any liability." (Italics supplied.)

B. *National Tea.*

The instrument entered into with the National Tea Company on November 30, 1956, was denominated a "lease agreement."

1. *Premises.*

(a) *Description.* That instrument stated that the lessor "demises and leases" to the lessee the premises described as follows:

"A one story concrete block store consisting of approximately 15,000 square feet to be located in the Twin Plaza Shopping Center abutting Rice Street between Montana and Arlington Avenues, which demised premises are definitely located on plat plan attached hereto and more particularly described in, and subject to the terms and conditions set forth in the rider hereto attached and made a part hereof."

The rider provided:

"The premises covered by this lease are described as follows: That portion of the building indicated as Store No. 29 on the plat plan of the Twin Plaza Shopping Center which is hereto attached and made a part of this lease, erected on [description of entire shopping center premises] * * *.

"The demised premises will consist of a one-story concrete block store without basement, approximately one hundred twenty-five feet (125') wide and one hundred twenty feet (120') in depth."

(b) *Duty to Construct.* By other provisions of the instrument, defendant covenanted to begin construction on or before September 1, 1957, and to proceed with due diligence to complete the premises by March 1, 1958.

2. *Term.*

Another provision stated:

"Although the term of this lease is for a period of ten (10) years from and after the 1st day of March, 1958, it is understood between the

parties that the premises are not presently ready for occupancy and that it is contemplated by the parties that the premises will be completed and ready for occupancy on or before March 1, 1958."

### 3. Right to Terminate.

The lessee was empowered to cancel if construction were not commenced on said date, by giving the lessor written notice of cancellation prior to actual commencement of construction, whereupon, if the lessor did not commence construction within 30 days of such notice, the lease would terminate and be of no force and effect. If construction were not completed (except by reason of enumerated extraordinary causes) by September 1, 1959, the lessee was empowered to cancel the lease by written notice given at any time thereafter prior to its actual acceptance of the premises.

### 4. Exculpatory Clause.

Still another provision stated:

"It is further agreed that lessor shall not be liable for failure to deliver the possession of the demised premises on March 1, 1958, nor shall such failure excuse lessee's obligations hereunder."

### C. Falcon.

Another such instrument, called a "lease agreement," was entered into with Falcon Dry Cleaners, Inc., on November 18, 1958.

### 1. Premises.

(a) Description. The agreement states that the lessor "does hereby demise, lease and let unto the said Lessee, and the said Lessee does hereby hire and take from the said Lessor," premises described as follows:

"A one-story mercantile store, approximately 60' in depth and approximately 20' in width, being contained in the general premises known as the Twin Plaza Shopping Center, designated as Store #A-3 on the Plat Plan of the said Twin Plaza Shopping Center, marked 'Exhibit A', attached hereto and made a part hereof, the said demised premises to be constructed and contained on a portion of the following-described property comprising the said Twin Plaza Shopping Center: [description]."

(b) *Duty to Construct.* A later provision in the instrument is as follows:

"Lessor agrees to proceed with due diligence to complete the said demised premises on or before June 1, 1959, unless prevented from doing so by reason of strikes, labor stoppages, wars, civil commotion, shortages of materials, governmental restrictions on building or other emergencies beyond Lessor's control."

## 2. Term.

The term was stated as being "fifteen (15) years from and after the 1st day of June, 1959, to the 31st day of May, 1974." A 5-year option was also provided. Provisions as to delivery of possession and commencement of duty to pay rent are as follows:

"It is agreed by and between the parties that Lessee will exert its best efforts and proceed with due diligence to commence to do business on the demised premises as soon as practicable after the said demised premises are completed, and that the effective date of the obligation for the payment of rent shall be considered as the date when the Lessee actually commences doing business on the demised premises, with the specific understanding that the date of the obligation for the payment of rental by the Lessee shall not exceed fifteen (15) days from the date of the completion of construction of the demised premises."

## 3. Exculpatory Clause.

Immediately following defendant's agreement to complete the premises, a proviso appeared:

"* * * However, it is agreed that Lessor shall not be liable for failure to deliver the demised premises on or before June 1, 1959, nor shall such failure excuse Lessee's obligation hereunder."

In our opinion these agreements created neither an interest in the land here involved nor a contract to make a lease specifically enforceable as against the buyer. Consequently, the failure to disclose the leases was not, in and of itself, a fraud. Further, if negative reference to "rights of tenants" and "restriction on use" in the June 22, 1961, contract could be considered as affirmative representations of what the state of the title

was on that date (rather than what it would be upon delivery of a warranty deed), the agreements did not create tenancies or use restrictions binding on the buyer.

The trial court concluded otherwise, stating:

"* * * The four instruments in question * * * must be considered leases which were to be effective in the future. * * * The four unrecorded leases constituted valid interests in the Rice Street property. * * * [W]hile Twin Plaza may have abandoned or postponed its plans for a shopping center on the Rice Street property, some of the tenants who had leases had not abandoned such rights as the leases gave them."

It has been stated that the fact that a term is to commence in futuro does not prevent the instrument from operating as a present demise, 51 C. J. S., Landlord and Tenant, § 185, p. 788, and that a valid term for years may be created to begin in futuro. Id. § 28. Occasionally it is said that a lease may be made of property not in existence or not completed at the time of the contract. Id. § 207. But this does not mean that an interest in land is created by the "lease" of a building not yet built. The 1956-1958 agreements refer to a "building" or "store" and make no reference to an interest in land being passed. Although this might be less significant in short and abbreviated documents, the ones in question were not of that type. In a lengthy and detailed lease, where the conveyance purports to be only of a "store" or "building," it seems fair to say that if the parties had intended the conveyance to be of something additional thereto, they would have said so.

The 1956-1958 agreements were not operative leases. Except where the proposed lessee is in possession, see Bradley v. Metropolitan Music Co. 89 Minn. 516, 95 N. W. 458; Galante v. Hathaway Bakeries, Inc. 6 App. Div. (2d) 142, 176 N. Y. S. (2d) 87; 51 C. J. S., Landlord and Tenant, § 194; contra, United States v. 257.654 Acres of Land (D. Hawaii) 72 F. Supp. 903, an executory agreement to lease does not convey an interest in land. See, Whalen v. Galy, 211 Mich. 30, 177 N. W. 954; Dan Cohen Realty Co. v. National Sav. & Trust Co. (E. D. Ky.) 36 F. Supp. 536; Jackson v. Delacroix, 2 Wend. (N. Y.) 433; 51 C. J. S., Landlord and Tenant, §§ 185, 194.

The fact that a document covers a building yet to be constructed implies that the transaction is at most an agreement to lease rather than a lease. See, Donovan v. P. Schoenhofen Br. Co. 92 Mo. App. 341; 51 C. J. S., Landlord and Tenant, § 185, p. 788; cf. Minn. St. 336.2—105(2), (Uniform Commercial Code—purported present sale of future goods operates as contract to sell). In point is Jackson v. Delacroix, *supra*. In that case the plaintiff had entered into an arrangement with the defendant whereby the latter would make certain improvements upon a 2-story building and lease a part of the building to the former. The defendant found that the building was so much damaged and had such a weak foundation that the specified improvements could not safely be made, so he had the building demolished and constructed in its place a 4-story building, differing considerably from the old one. The plaintiff, arguing that he could waive exact compliance, brought an action for ejectment against the defendant. The court held as a matter of law that the action would not lie on the ground that the instrument in question was not a lease but merely an agreement to lease. The court stated (2 Wend. [N. Y.] 441):

"* * * The habendum clause is as follows: 'To have and to hold the said above mentioned and described store, cellar and privileges, with the appurtenances, unto the said U. B. his executors, administrators and assigns, *from the day that the said store and cellar shall be altered and improved in the manner above mentioned.*' That day has not arrived; the store and cellar have not been improved in the manner agreed upon. * * * The contract has not been fulfilled on the part of the defendant, and it seems to me, therefore, that whatever liability rests upon the defendant for a breach of his covenant, the remedy * * * is not in this form of action."

One of the documents in the present case was denominated a "lease" and the other two were called "lease agreements," but the name given to the document by the parties is not controlling. Bradley v. Metropolitan Music Co. *supra*.

It is not possible to pass a present interest in property not in exist-

ence.[3] The 23-acre tract was, of course, in existence when the agreements were made. But the parties to the agreements were not interested in a lease of the land as such. The owner of the tract, it is clear, was proceeding during the 1956 to 1958 period on the theory—or in the hope—that a sufficient number of prospective tenants could be secured to make a shopping center feasible. None of the prospective tenants was interested in renting a building, even if constructed, unless other mercantile establishments were to be in operation on the site. It is generally true that the lease of a building is a lease of the land on which it stands. Lanpher v. Glenn, 37 Minn. 4, 33 N. W. 10. But here (in addition to the dependence of each prospective tenancy on the existence of others) there never was a building constructed.[4] If the agreements could be construed as leases to become operative upon the erection—or even the partial erection—of a satisfactory building, we would still lack an essential point of reference here. No building of any kind was ever commenced. An executory agreement to lease a building when and if constructed cannot convey an interest in land. The fact that the result might be different when the prospective lessee takes possession of the premises does not aid plaintiff in the present case, where the persons thought of as lessees never did so. The fact that an agreement is called a lease does not make it one. Whatever liability the owner may have under agreements of this kind if he fails to erect a shopping center as visualized at the time the agreements with prospective tenants were made, no such rights are created as would give a prospective tenant of

---

[3] The discussions of leases by the textwriters imply the necessity that the thing leased be in existence. See, Jones, Landlord and Tenant, § 142; McAdam, Landlord and Tenant (5 ed.) § 84; Tiffany, Landlord and Tenant, § 62, p. 372: "* * * [A] contract for a lease gives the proposed lessee no right of possession which he can assert against the lessor or against third persons, * * *"; Woodfall, Landlord and Tenant (25 ed.) § 483.

[4] 51 C. J. S., Landlord and Tenant, §§ 28, 185; cf. Minn. St. 336.2—105(2). Compare, Rice v. Brown, 81 Maine 56, 16 A. 334; Arndt v. Ball, 342 Mich. 649, 70 N. W. (2d) 746; People v. Kelsey, 38 Barb. (N. Y.) 269, 14 Abb. Pr. 372. In all these cases the construction was completed by the time suit was brought. In Kelsey the court stated that the instrument took effect as a lease when the premises were completed.

the building any estate in the land before the building comes into existence.

The conclusion that these "leases" created no interest in the land, as the building to be leased never came into existence, is supported by practical as well as logical considerations. The public policy which encourages the best possible present use of land—and underlies the rule against perpetuities—would be ill served by finding that an agreement to lease upon a contingency which has not occurred creates an interest in the land preventing its use for another purpose capable of realization.[5]

A number of law review articles have been written to aid drafters of shopping center leases, but none of them are helpful in determining what the effect of such leases should be when construction and other prerequisites to completion have not been commenced approximately a year and a half to three years subsequent to the scheduled date of completion.[6]

■ The "lessees" named in the 1956-1958 agreements could not have secured specific performance as against Target, the buyer, for this combination of reasons:

(1) The plans attached to the agreements are not in sufficient detail to be used as a basis for accurate directions to build.[7]

---

[5] There is authority for the proposition that a lease to commence upon completion of a building is void as a violation of the rule against perpetuities. Haggerty v. City of Oakland, 161 Cal. App. (2d) 407, 326 P. (2d) 957, 66 A. L. R. (2d) 718, 47 Calif. L. Rev. 197. But note, Isen v. Giant Food, Inc. 111 App. D. C. 149, 295 F. (2d) 136; 37 Notre Dame Law. 561; Note, 47 Calif. L. Rev. 197.

[6] See, Brummund, *Shopping Center Leases*, 1 Practical Law. 66; Colbourn, *A Guide to Problems in Shopping Center Leases*, 29 Brooklyn L. Rev. 56; Goldstein, *Practical Aspects of Real Estate Developments: Illustrated by a Shopping Center Project*, 18 N. Y. U. Inst. Fed. Tax. 119; Hemingway, *Selected Problems in Leases of Community and Regional Shopping Centers*, 16 Baylor L. Rev. 1; Pollack, *Shopping Center Leases*, 9 Kan. L. Rev. 379.

[7] See, Johnson v. Skillman, 29 Minn. 95, 12 N. W. 149; Ham v. Johnson, 55 Minn. 115, 56 N. W. 584; 81 C. J. S., Specific Performance, §§ 48, 74; Tiffany, Landlord and Tenant, § 67, p. 394; Woodfall, Landlord and Tenant (25 ed.) §§ 421, 428.

(2) The court could not compel the owner to secure leases from other tenants unwilling to participate in the venture.[8]

(3) The agreements were terminable at the will of the prospective lessees, and equity is reluctant to act in situations where the parties have dealt on equal terms to compel one party to enter a continuing relationship where the other party could not be so compelled.[9]

(4) Up to the point, at least, where the prospective lessees had taken some irrevocable steps contemplating the operation of a business on the leased premises, the remedy of damages, as against the owner for breach of contract—or of duty arising from the existence of the contract—would be adequate.[10]

(5) Inaction by the persons said to be lessees until 1961 weakened their claim for specific performance of an unrecorded agreement relating to land.[11]

In Boulevard Plaza Corp. v. Campbell, 254 Minn. 123, 94 N. W. (2d) 273, this court held that the plaintiff, who took no action under a purchase agreement for 18 months, could not enforce it against the vendor. The facts are distinguishable on the ground that the inaction included failure to make payments due and requested by the defendant under the agreement, but the following reasoning bears upon the present case (254 Minn. 134, 94 N. W. [2d] 283):

"* * * It is a well-established rule, where similar facts are involved, that unless he who seeks the aid of equity in enforcing a contract for the conveyance of land shall have been prompt, ready, and eager to per-

---

[8] See, Carlson v. Doran, 252 Minn. 449, 90 N. W. (2d) 323; 51 C. J. S., Landlord and Tenant, §§ 27, 215; 81 C. J. S., Specific Performance, § 48.

[9] See, 81 C. J. S., Specific Performance, § 11(e); Reichert v. Pure Oil Co. 164 Minn. 252, 204 N. W. 882. See, Peterson v. Johnson Nut Co. 204 Minn. 300, 283 N. W. 561. Compare, Dahlberg Brothers, Inc. v. Ford Motor Co. 272 Minn. 264, 137 N. W. (2d) 314.

[10] McClane v. White, 5 Minn. 139 (178); Granva Corp. v. Heyder, 205 Va. 660, 139 S. E. (2d) 77; 81 C. J. S., Specific Performance, § 6.

[11] Johnson v. Fitzke, 234 Minn. 216, 48 N. W. (2d) 37; Melco Investment Co. v. Gapp, 259 Minn. 82, 105 N. W. (2d) 907.

form upon his part and have exercised good faith and been diligent, the relief demanded should be denied him."

We conclude therefore that the agreements created no interest in the land and were not specifically enforceable as against the buyer. Sands v. United States (W. D. Wash.) 198 F. Supp. 880, and Maida v. Kroger Co. (E. D. Tex.) 230 F. Supp. 668, cited by plaintiff, do not persuade us otherwise. Because the trial court was of the opposite view, a new trial is necessary.

■ Our conclusion that the 1956-1958 agreements did not in fact adversely affect the seller's title does not mean that the title was a marketable one. This is so because the marketability of a title turns not only on what interest can be successfully asserted as against a prospective buyer, but also on what a prudent buyer might reasonably, though erroneously, apprehend to be the resolution of a doubtful question affecting the title. In the present case—and until now—the resolution of the question of whether these agreements created an interest in the realty was in serious doubt.

In Hubachek v. Maxbass Security Bank, 117 Minn. 163, 169, 134 N. W. 640, 642, we said:

"* * * A marketable title * * * is one that is free from reasonable doubt; one that a prudent person, with full knowledge of all the facts, would be willing to accept. A title that may involve the purchaser in litigation to remove apparent or real defects appearing upon the face of the record is not one which the vendee will be compelled to accept. The question is, not whether a court would on the facts disclosed adjudge the title good, but whether, without the aid of a specific decision, the title is so far free from doubt that a reasonable person, acting in good faith, would accept it. *The question must be considered from the standpoint of the intending purchaser, and not from the viewpoint of the court.*" (Italics supplied.)

The doubt in that case resulted from the circumstance that a deed in the chain of title was by a guardian who had failed to give a bond as required by the statute of North Dakota. The opinion concludes (117 Minn. 169, 134 N. W. 642):

"* * * The decisions of the courts where the question has been passed upon are at variance, the Supreme Court of North Dakota has not spoken upon the subject, and plaintiff could not be required to anticipate a favorable decision of that tribunal, nor by accepting the title resolve the doubt in favor of the vendor."

In the present case the existence of the 1956-1958 agreements put the seller's title in doubt. The trial judge in a scholarly memorandum has reasoned that an adverse interest was created by those agreements. Recognizing the closeness of the question, we have held otherwise. The attorney who examined for the buyer was on valid grounds when, as of February 1962, he recommended rescission for nonmarketability and, in our opinion, he had adequate reason for doing so.

■ But to say that a buyer is entitled to rescind because of a reasonable belief that a title is not marketable is not to say that the party rescinding is entitled to recover damages sustained prior to rescission. Either he is or he is not depending on whether the damage was caused by the seller's fraud. As we have decided, fraud in this case cannot be based upon the theory that the agreements created a tenancy or a restriction upon the use of the premises by the buyer.

It can be argued, of course, that *active concealment* of material facts which would give rise to a reasonable *doubt* as to the marketability of the title is fraudulent; or that a *partial disclosure* of some such facts is active concealment of material facts not disclosed; or that by reason of a *disparity of competence* or *fiduciary status*, a positive duty to disclose facts which would be material in the opinion or judgment of a reasonable prospective buyer arises and that the failure to disclose an assertable but not sustainable unrecorded claim involving the realty is the equivalent in such circumstances to an affirmative representation that such claims, though actually untenable, do not even exist. But, probably because the case was tried and decided on the theory that the leases created an adverse interest in the realty, there is no finding that any such special situation existed here.

In the absence of such a finding, fraud cannot be premised on mere nondisclosure of a dubious claim to an interest in realty which is the

subject of a purchase agreement. The applicable rule is as stated in Restatement, Torts, § 551, as follows:

"(1) One who fails to disclose to another a thing which he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter which he has failed to disclose, *if, but only if,* he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated

"(a) such matters as the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them,

"(b) any subsequently acquired information which he recognizes as making untrue or misleading a previous representation which when made was true or believed to be so,

"(c) the falsity of a misrepresentation which when made was not made for the purpose of its being acted upon if he subsequently ascertains that the other is about to act in reliance upon it in a transaction with him.

\* \* \* \* \*

*"Comment on Subsection* (1):

*"a. Unless he is under some one of the duties of disclosure stated in Subsection (2), one party to a business transaction is not liable to the other for harm caused by his failure to disclose to the other facts of which he knows the other is ignorant and which he further knows the other, if he knew of them, would regard as material in determining his course of action in the transaction in question. \* \* \**

*"b.* The conditions under which liability is imposed for nondisclosure in an action for *deceit differ* in one particular from those under which a similar nondisclosure may confer a right to *rescind* the transaction or to recover back *money paid* or the *value of other benefits conferred.* In the absence of a duty of disclosure, under the rule stated in Subsection (2) of this Section, one who is negotiating a business transaction is

not liable in deceit because of his failure to disclose a fact which he knows his adversary would regard as material. On the other hand, as is stated in § 472, Comment *b,* Restatement of the Law of Contracts, the other is entitled to rescind the transaction if the undisclosed fact is basic and under Restatement of the Law of Restitution, § 8, Comment e, would be entitled to recover back any money paid *or benefit conferred in consummation of the transaction."* (Italics supplied.)

■ It may be that even if there was no fraud the buyer is entitled to recover, by way of restitution, the reasonable value of any improvement made to the realty before rescission. Prosser, Torts (3 ed.) § 100, pp. 701 to 703, and cases cited in footnote 64; Restatement, Restitution, § 8, *comment e.* But that problem is not before us at this time.

■ We do not agree that the seller is entitled to specific performance as a matter of law on the theory that the buyer has made an irrevocable election to affirm. The trial judge commented in this respect:

"* * * The June 22, 1961, Purchase Agreement provides in part as follows:

" '* * * but if the title to said property be found marketable, or be made so within said time, and said buyer shall default * * * in that case the said seller may terminate this contract, and on such termination all the payments made upon this contract shall be retained by said seller * * * as liquidated damages, time being of the essence hereof, but this provision shall not deprive either party of the right of enforcing the specific performance of this contract provided such contract shall not be terminated as aforesaid, and provided action to enforce such specific performance shall be commenced within six months after such right of action shall arise.'

"It is to be noted that the right of specific performance is contingent upon (1) that the purchase agreement has not been terminated, and (2) that an action seeking specific performance is commenced within six months after the right of action accrues. Neither one of the contingencies is satisfied. The purchase agreement was terminated on February 26, or 28, 1962, by service of the letter of February 23, 1962, and if not, was terminated thirty days after service of the Notice of Termination on

May 24, 1962. The first claim of specific performance was in the counter-claim to Target's amended complaint, dated February 10, 1964, which is more than six months after the alleged right of action for specific performance accrued. Twin Plaza's counterclaim is denied."

We agree.

Upon retrial the evidence on the issue of waiver should be reevaluated in light of our holding that the 1956-1958 agreements did not in fact create an adverse interest in the land although the doubt created by the leases justified rescission for nonmarketability. We do not believe that the execution of "confirmation of assignments" after discovery of the agreements; the asserted claim for damages on the theory of fraud; the cooperation of the buyer with the seller in the effort to secure releases of the 1956-1958 agreements; or the buyer's delay establish waiver as a matter of law.

Target Stores, Inc., has moved that the judgment heretofore entered in its favor should not be vacated pending the outcome of the new trial. We could, no doubt, direct that the lien of the judgment be preserved pending retrial. See, Ayer v. Chicago, M. St. P. & P. R. Co. 189 Minn. 90, 248 N. W. 749. Respondent urges that we do so here, being apprehensive that an attachment lien on the realty involved which it established prior to the entry of the judgment became merged in the judgment when it was entered and will be lost now if the judgment is vacated. Its concern comes about because of our decision in McDonald v. Clark, 53 Minn. 230, 231, 54 N. W. 1118, where this court held that a motion to vacate an attachment was properly denied after entry of judgment in the action giving rise to the levy because "its lien had become merged in that of the judgment." But the rationale of McDonald v. Clark, *supra,* does not apply where the merging judgment is vacated on appeal. In such a case, we now hold, the lien of the attachment is revived and stands as if judgment had never been entered.

Reversed.