**In the Matter of WONDERFAIR STORES, INC. OF ARIZONA, Debtor.**

**Sam JONAS, Trustee-Appellant,**

v.

**WALGREEN ARIZONA DRUG CO., Petitioner-Appellee.**

**WALGREEN ARIZONA DRUG CO., Plaintiff-Appellant,**

v.

**Mary Ann LEVITT et al., Defendants-Appellees.**

**Nos. 73–1712, 73–2055.**

United States Court of Appeals, Ninth Circuit.

Feb. 6, 1975.

Jerry R. Cahan (argued), Pasadena, Cal., for appellant.

Raymond Wallenstein (argued), Los Angeles, Cal., for appellee.

## OPINION

Before DUNIWAY and CARTER, Circuit Judges, and ORRICK,* District Judge.

JAMES M. CARTER, Circuit Judge:

These appeals were argued the same day and we consider them in one opinion. They each involve the same lease and the same legal issues.

### Appeal No. 73–1712

This is an appeal from the Order of the District Court for the Central Dis-

---

* Honorable William H. Orrick, United States District Judge, Northern District of California, sitting by designation.

trict of California, reversing in part and affirming in part the Order of the Referee in Bankruptcy in proceedings under Chapter X of the Bankruptcy Act. The controversy involves the validity of a purported lease of real property in a proposed shopping center, between appellee Walgreen Arizona Drug Co. ("Walgreen") as "Tenant" and debtor Wonderfair Stores, Inc. of Arizona ("Wonderfair") as "Landlord." The Trustee, Sam Jonas, seeks to avoid or cause to be invalidated the lease so that he may sell the land involved free of encumbrances.[1]

The effect of the district court's Order is that the Agreement is held to be:

I. sufficiently definite and certain to be enforceable;

II. a lease, vesting present, enforceable property rights in the *land* in question, rather than an executory contract for a lease, providing for *future* rights to a *building* to be constructed;

III. not in violation of the rule against perpetuities; and

IV. superior to the interest of the Trustee, because although improperly recorded, it was sufficient to put the Trustee on inquiry notice.

The Trustee disputes this holding in all respects. We affirm.

### FACTS

The petition for corporate reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 et seq., was filed by Wonderfair on March 15, 1967, and an order approving the petition, appointing a trustee, and referring the matter to a Referee and Special Master, was made the same day.

The principal asset of the debtor Wonderfair at the time of the institution of the Chapter X proceedings consisted of approximately 18.8 acres of land at the northeast corner of McDowell Road and Scottsdale Road in Scottsdale, Arizona ("Shopping Center Site") as described in the Agreement between Walgreen and Wonderfair.[2]

---

1. The Trustee has already sold and conveyed title to. (subject to encumbrances or obligations of record) the land upon which the building to be occupied by Walgreen was to be erected. Walgreen filed an action in Arizona to protect its interest in the property. The Arizona district court granted summary judgment against Walgreen, and the appeal, No. 72–2055, is presently before this court and is considered *infra*.

2. The Wonderfair-Walgreen Lease provides in pertinent part:

1. "Landlord hereby leases to Tenant, and Tenant hereby rents from Landlord, for the term commencing January 1, 1966, and continuing to and including December 31, 1985, subject to prior termination as hereinafter provided, the premises located in [the Shopping Center Site] being a rectangular area containing 21,000 square feet on the first floor (all as shown on plan(s) hereto attached and made part hereof) . . . and together with all improvements, appurtenances, easements and privileges belonging thereto, in the new one story . . . building to be erected and completed by Landlord as part of East Gate Shopping Center . . . being the area shown as outlined in red on said plan."

2. "Tenant shall pay as rent for the leased premises, as follows:

(a) A fixed rent of $2,887.50 per month, commencing either on the date Tenant opens its store for business in the leased premises, or as provided in Article 6, whichever is the earlier;"

3. "(a) If the rent shall not have begun to accrue on the date shown specified for the commencement of the term of the lease, then the term shall not commence until the date on which the rent begins to accrue and shall continue for twenty years thereafter; . . . . "

4. "Landlord shall put Tenant into simultaneous exclusive physical possession of the leased premises on January 1, 1966, or as soon as possible thereafter, and in any case not later than January 1, 1967. . . . . If possession is not delivered by the latest date above mentioned, Tenant may cancel this lease. . . . "

5. "(a) Before delivering possession of the leased premises to Tenant, Landlord shall erect and complete the aforesaid new building containing the leased premises, which new building shall be a modern one story . . . structure. That portion of said new building containing the leased premises shall be of such exterior and structural design and character as is acceptable to Tenant. . . . The leased premises shall be erected and completed by Landlord, and shall contain Tenant's specific requirements for the operation of Tenant's business, which requirements will include among other things, the items and in-

On April 6, 1965, Wonderfair and Walgreen executed a document denominated as a "lease" of a building to be constructed on part of the Shopping Center Site. The instrument was acknowledged that day before a notary public in Los Angeles, California. Also on the same day, Wonderbowl-Downey, Inc. executed and duly acknowledged a document attached to the Walgreen Lease, which provided in part: "to induce the execution by Walgreen . . . of the attached lease" Wonderbowl-Downey, Inc., owner of the parcels outlined in green on the plan attached to the Walgreen Lease, "joins in the foregoing lease to indicate its agreement that said parcels . . . shall be bound by the provisions of Article 9 thereof." This document was recorded with the Walgreen "Lease". At the same time, Walgreen Co., an Illinois corporation, executed and duly acknowledged a Guaranty of Walgreen of Arizona's performance under the Lease. This document was recorded with the Lease and the Wonderbowl-Downey Agreement.

Between April 13 and August 16, 1965, Walgreen and Wonderfair agreed upon certain contractual modifications to reflect amendments made between Wonderfair and another prospective Shopping Center tenant ("Bob's Big Boy"),

stallations listed in Exhibit "A" hereto attached and made part hereof . . . .. All such work by Landlord shall be done by contractors selected by Landlord and acceptable to Tenant and shall comply with the requirements of public authorities. . . . "

"(b) Landlord shall furnish to Tenant architectural drawings and full details and information relative to said new building, so that Tenant may be enabled to prepare and furnish to Landlord . . . Tenant['s] plans and specifications covering Tenant's specific requirements. . . . "

6. "Tenant shall open its store for business in the leased premises within a reasonable time, but not later than three months after Landlord has completed all construction and has delivered possession as above provided . . . .."

8. "(a) It is expressly understood and agreed that the installation in said Shopping Center of—

(1) A Mayfair Markets' El Rancho super food market with a floor area of at least 21,-000 square feet . . .

(2) A Bob's Big Boy Restaurant with a floor area of at least 4,300 square feet . .

are each primary inducements to Tenant in entering into this lease and agreeing upon the rentals herein reserved. Therefore, it is a further express condition of this lease that Landlord shall furnish and deliver to Tenant, at or before the time for giving of the notice of possession provided for in Article 4, evidence reasonably satisfactory to Tenant, that leases, each for a term of at least ten years firm, and commencing not later than January 1, 1966, have been consummated for the installation and operations of all of the business above mentioned . . . .."

"(b) Anything in this lease to the contrary notwithstanding, Tenant shall not be obligated to open its store for business in the leased premises, nor shall any rent accrue under this lease, prior to the time when—

(i) Occupants of 80% of the area in all of the buildings . . . (including all of the businesses described in Section (a) hereof which shall be at the respective stated locations), which buildings shall contain not less than 70,000 square feet of floor area, are open for business, and,

(ii) All of the buildings shown within the area outlined in red on said attached plan, which buildings shall contain not less than 70,000 square feet of floor area, are substantially completed, and,

(iii) All of the parking and other facilities described in Article 7 have been completed, paved and lighted are available for use."

13. "Landlord shall not grant any rights in the sidewalk around the leased premises without Tenants written consent. . . . "

19. "If Landlord shall from time to time fail to perform any act or acts required of Landlord by this lease and if such failure continues for thirty days after receipt of notice from Tenant, Tenant shall then have the right, at Tenant's option to perform such act or acts and the full amount of the cost and expense so incurred shall immediately be owing by Landlord to Tenant, and Tenant shall have the right and is hereby irrevocably authorized and directed to deduct such amount from the rent. No delay on the part of either party in enforcing any of the provisions of this lease shall be considered as a waiver thereof."

25. " . . . This instrument shall also bind and benefit, as the case may require, the heirs, legal representatives, assigns and successors of the respective parties, and all covenants, conditions, and agreements herein contained shall be construed as covenants running with the land."

and to correct several mathematical and typographical errors.

On August 16, 1965, new pages 4, 5, and 9 were prepared by Walgreen and the pages, reflecting the above modifications, transmitted to Wonderfair to be initialed and then returned to Walgreen for incorporation in the Lease. On October 4, 1965, Walgreen executed the Lease containing the substituted pages 4, 5, and 9 duly initialed by Wonderfair, returning one executed copy to Wonderfair, together with the executed copies of the Wonderbowl Agreement and Walgreen Co. Guaranty, and retaining one copy which it forwarded to the County Recorder of Maricopa County, Arizona, and which was so recorded on October 19, 1965. The Lease was not re-acknowledged before a notary public.

## DISCUSSION

### I. *The Lease is sufficiently definite and certain to be enforceable.*

The Trustee contends that the inclusion in the Lease of conditions precedent (as yet unperformed by either party) and terms to be agreed upon in the future, renders the Agreement unenforceable as too uncertain and indefinite. We disagree.

■ We are guided by the general principle that "the law does not favor but leans against the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained." Wong v. Di Grazia, 60 Cal.2d 525, 539, 35 Cal.Rptr. 241, 251, 386 P.2d 817, 827 (1963). *See also* Henderson v. Jacobs, 73 Ariz. 195, 239 P.2d 1082 (1952). On February 18, 1966, Wonderfair submitted to Walgreen the architectural drawings, etc., and Walgreen transmitted its plans and specifications to Wonderfair, as required under 5(b) of the Lease. All of the other allegedly uncertain and indefinite terms relate to provisions in 5(a) and (b) for plans, designs, contractors, etc., "*as is acceptable to Tenant.*"

Although on the face of the lease such provisions are uncertain, good faith on the part of the parties may be inferred "to carry into effect the reasonable intentions of the parties." *Wong, supra,* 60 Cal.2d p. 539, 35 Cal.Rptr. p. 251, 386 P.2d p. 827. This view has been adopted by most courts which have considered the issue. The validity of such "on approval" or "satisfaction" clauses is exemplified by Mattei v. Hopper, 51 Cal.2d 119, 124, 330 P.2d 625, 627 (1958), where the California Supreme Court stated:

> "[T]he secondary authorities are in accord with the California cases on the general principles governing 'satisfaction' contracts. 'It has been questioned whether an agreement in which the promise of one party is conditioned on his own or the other party's satisfaction contains the elements of a contract—whether the agreement is not illusory in character because conditioned upon the whim or caprice of the party to be satisfied. Since, however, such a promise is generally considered as requiring a performance which shall be satisfactory to him in the exercise of an honest judgment, such contracts have been almost universally upheld.' (3 Williston, Contracts (rev. ed. 1936) § 675A, p. 1943; see also 3 Corbin, Contracts (1951), §§ 644, 645, pp. 560–572.)"

■ Since the proper plans, specifications, and drawings had been exchanged and "reasonableness" or "good faith" may be inferred with respect to the terms which must be "acceptable to Tenant", we hold that the contract is sufficiently definite and certain.

### II. *The Lease conveyed a presently enforceable interest in the underlying land and was not merely an executory contract to enter into a lease of a building to be constructed in the future.*

■ The Trustee contends that Walgreen was primarily interested in leasing a building to be built in the future. If the building was not completed or if some of the other conditions (e. g., occu-

pancy of 80% of the area in all of the buildings and the installation of a Bob's Big Boy and a Mayfair Markets' El Rancho supermarket in the Shopping Center) could not be met, there would be no duty upon Walgreen to pay rent. These factors, the Trustee argues, indicate an executory contract for a lease and not a lease itself, and therefore no estate or right of possession in the land itself ever vested in Walgreen. We agree with the district court that the agreement constituted "a valid transfer of a leasehold estate, not merely a contract to make a lease."

As stated in 51C C.J.S. Landlord & Tenant § 185, at p. 495: "The controlling consideration in determining whether an instrument is a present demise or merely an agreement to lease is the intention of the parties, collected from the whole instrument and, in case of ambiguity, from the surrounding circumstances." That Wonderfair and Walgreen intended their agreement to be a lease rather than a contract to make a lease is evident from the terms of the agreement itself.

First, the agreement uses the present tense, "hereby leases", with respect to the "premises" which are being conveyed, although the building is "to be erected" in the future. The use of the present tense contemplates that something was being contemporaneously conveyed, and the only thing that could have been so conveyed was the "premises" or underlying real estate. Further, the agreement reserves to Walgreen certain rights in sidewalks and parking areas in addition to the building to be constructed.

Second, Article 19 of the agreement gives Walgreen the right to enter upon the land and perform any act or acts required of Wonderfair and which Wonderfair has failed to perform for thirty days after receipt of notice from Walgreen. The Trustee concedes that this provision would give Walgreen the right to construct its own building on the land should Wonderfair fail to do so, and deduct the cost from the rent. This right indicates a possessory interest in the land itself.

Third, Article 25 provides that the Lease "shall also bind and benefit, as the case may require, the heirs, legal representatives, assigns and successors of the respective parties, and all covenants, conditions and agreements herein contained shall be construed as covenants running with the land." The effectiveness of these covenants running with the *land* is not postponed until the completion of the building, but occurs at the time of the signing of the agreement. The covenants immediately became burdens and benefits on the leasehold estate and the reversion in the land itself, regardless of who the owners of such estates may be. As Tenant under the lease and covenantee of the covenants running with land expressly created by the lease, Walgreen had an interest in the underlying land and rights affecting the landlord's reversion. "[A]ny interest . . . which takes away a part of the sum total of rights, powers, privileges, and immunities which go to make up a fee simple absolute is an existing interest." I American Law of Property, § 4.1, at p. 407.

The Trustee's reliance on the Minnesota case of Target Stores, Inc. v. Twin Plaza Co., 277 Minn. 481, 153 N.W.2d 832 (1967), is misplaced. In *Target Stores, supra,* the plaintiff (Buyer) undertook to acquire a twenty-three acre parcel from the defendant (Seller). The Buyer sought to recover its downpayment and damages for fraudulent misrepresentation when it discovered that two years earlier the Seller had entered into three unrecorded agreements with retail concerns. At that time, the Seller had attempted to develop a shopping center. When the shopping center fell through, all parties had lost interest in the lease agreements, and the Seller had not indicated them to the present Buyer. The Buyer, however, believed the three lease agreements to represent a cloud upon the Seller's title to the property. Besides seeking damages, the Buyer rescinded the sales agreement and pur-

chased other land. The Seller secured releases from the "lessees" under the unrecorded agreements, tendered performance to the Buyer, and counterclaimed for specific performance. The Minnesota Supreme Court held that the failure of the Seller to disclose the unrecorded agreements did not constitute fraud *since the agreements did not create an interest in the land,* but because the issue was close, the Buyer was entitled to rescind the sales agreement because the Seller's title had reasonably been in doubt.

There is much language in *Target Stores* that would appear to be applicable to the present case. Also, the lease agreements in *Target Stores* and the Wonderfair-Walgreen lease are very similar. However, we believe that the present case is distinguishable in significant ways from *Target Stores,* and that the agreement between Walgreen and Wonderfair did in fact create an interest in the underlying land.

While recognizing that "the fact that a term is to commence in futuro does not prevent the instrument from operating as a present demise, 51 C.J.S. Landlord and Tenant § 185, p. 788," and that "a valid term for years may be created to begin in futuro. Id. § 28," the court in *Target Stores* found that both the lease itself and the actions of the parties indicated that they intended an agreement to lease a building when it was built. The court noted the following factors:

1) The agreements referred only to "buildings" and made no reference to an interest in land being passed.

2) No rights or liabilities on the part of either party arose until the completion of the buildings.

3) Not only were the buildings never built, but the plans were "not in sufficient detail to be used as a basis for accurate directions to build."

4) No rights or obligations arose until "Lessor shall execute leases with and complete buildings for at least (7) other bona fide tenants in the shopping center," and such leases had never been obtained nor would be obtained.

5) The leases were unrecorded.

6) Inaction by the "lessees" for three years and their willingness to sign releases indicated that they did not believe themselves to have an interest in the land itself.

These factors are not present in the instant case.

■■ 1) In the Wonderfair-Walgreen Lease, there are many references to the "premises," and Article 25 specifically refers to covenants running with the *land.* And, in any case, "[t]he general rule is that the lease of an entire building eo nomine is a lease of the land on which the building stands . . .. Where the lease is of the 'premises,' with no qualifying words, it is generally held that 'premises' means land and the buildings thereon . . .." 51C C.J.S. Landlord and Tenant § 289, at p. 741. *See* Bachenheimer v. Palm Springs Management Corp., 116 Cal.App.2d 580, 588, 254 P.2d 153, 157–158 (1953), and authorities cited therein.

2) Rights and liabilities arose prior to the completion of the building. For example, Walgreen had the right to build the store itself, if the Lessor failed to do so.

3) The plans and specifications had already been exchanged "in sufficient detail to be used as a basis for accurate directions to build."

4) Only two (not seven) other tenants were required to sign leases; and, instead of being unable to achieve this result (as in *Target Stores*), the Lessor did consummate such leases and at least Bob's Big Boy Restaurant has been built and installed in the shopping center.

5) As discussed *infra,* the "Lease" was properly recorded as a lease of realty.

6) Walgreen has at all times expressed interest in the construction of the building. The delay appears to be due to Wonderfair's postponements because of a "tight money market" and not Walgreen's abandonment of the whole idea.

We conclude therefore, that the district court properly found that the parties in the present case intended their

agreement to be a lease (not an executory contract to make a lease) of both the building and the land on which it was to be constructed.

### III. *The Lease does not violate the rule against perpetuities.*

■ Ariz.Rev.Stat. § 33–261.01 makes the common law rule against perpetuities applicable to all property. The rule provides: "No interest is good unless it must vest if at all, not later than 21 years after some life in being at the creation of the interest." Gray, Rule, Against Perpetuities § 201, at p. 191 (4th ed. 1942). Under a strict interpretation of this rule, the present Lease would fail, since there is a *possibility* that the building would not be completed within 21 years, and hence Walgreen's contingent estate would not actually vest in possession until possibly after that period. The Trustee contends that this strict construction is mandated by the Arizona statute, thus voiding Walgreen's leasehold estate. We disagree.

As discussed *supra,* we hold that the Lease vested a leasehold estate in the underlying land (the "premises") immediately upon the signing by both parties. Rights and liabilities arose, regardless of the future completion of the building. However, even if, as contended by the Trustee, an essential element of the estate—the building—must also vest within 21 years, the Wonderfair-Walgreen Lease does not violate the rule.

Wong v. Di Grazia, *supra,* 60 Cal.2d 525, 35 Cal.Rptr. 241, 386 P.2d 817 (1963) is right on point. There, the California Supreme Court stated: "Both the California cases, and those of a majority of other states, hold that a document should be interpreted if feasible to avoid the conclusion that it violates the rule against perpetuities." 60 Cal.2d at 539–540, 35 Cal.Rptr. at 251, 386 P.2d at 827 (footnotes omitted). The court indicated (pp. 530–536, 35 Cal.Rptr. 241, 386 P.2d 817) the many ways that courts have devised to avoid the harsh effect of the rule in its most strict interpretation, and then specifically held that the lease of a building to commence "upon completion of said building" and "upon approval of completed plans and specifications", does not violate the rule against perpetuities. 60 Cal.2d at 527 and 538, 35 Cal.Rptr. 241, 250, 386 P.2d 817, 826.

Simply by interpreting the lease to require completion and approval within "a reasonable time", and "a reasonable time" to be less than 21 years, the court was able to uphold the lease agreement. The court cited extensive legal authority for this interpretation (60 Cal.2d at 537, 35 Cal.Rptr. 241, 386 P.2d 817), and it is clearly proper.

Although the Arizona courts have never decided this issue, there is no reason to assume that they would choose the strict, outdated approach rejected by the majority of jurisdictions, particularly since they have never voided any real property interest as being in violation of the rule against perpetuities. *See generally,* Mason v. American Emery Wheel Works, 241 F.2d 906 (1 Cir. 1957).

The Trustee contends, however, that the Wonderfair-Walgreen Lease, unlike the lease in *Wong, supra,* does not require the construction of the building to "commence forthwith." Although of some weight, this difference is not crucial. As noted *supra,* if Wonderfair fails to construct the building, Walgreen has the right under the Lease to commence construction itself or to cancel the Lease. It would be utterly unreasonable for Walgreen neither to exercise its option to cancel the Lease nor opt to commence construction within 21 years.

The court in *Wong* rejected a similar argument, stating: "[W]e are not willing to predicate a transgression of the rule on the theory that agreements must be presumed to be broken and parties unwilling to enforce their rights." 60 Cal.2d at 538, 35 Cal.Rptr. at 250, 386 P.2d at 826. We are no more willing to find a transgression of the rule in the present case.

IV. *The Lease is superior to the interest of the Trustee, because both properly recorded, and sufficient to put the Trustee on inquiry notice.*

The Trustee's final contention is that even if the Lease is valid as between Walgreen and Wonderfair, it was improperly recorded under Arizona law and therefore is subordinate to the rights of the Trustee in bankruptcy.

Ariz.Rev.Stat., § 33–411 provides in part:

"A. No instrument affecting real property is valid against subsequent purchasers for valuable consideration without notice, unless recorded as provided by law in the office of the county recorder of the county in which the property is located.

"B. An instrument shall not be deemed lawfully recorded unless it has been previously acknowledged in the manner prescribed in this chapter . . . ."

■ There has never been any substantial argument that the Lease in the form originally acknowledged by Wonderfair was not recorded at all. But after the April 6, 1965, acknowledgment, pages 4, 5, and 9 were substituted and, although initialed by Wonderfair and inserted with its express consent, there was no re-acknowledgment before a notary public prior to recording. The Trustee, who stands in the shoes of hypothetical secured creditors at the time of bankruptcy (§ 70c of the Bankruptcy Act, 11 U.S.C. § 110c), contends that the agreement was thus improperly recorded, depriving it of priority under Arizona law.

■ There are two answers to this contention. The first is that the recording statute requires only that the agreement be "previously acknowledged." The additions, initialed by Wonderfair and acknowledged (although not before a notary public) by Walgreen were quite minor and in no way affected the leasehold transferred in the agreement. The Lease was duly recorded with the County Recorder and placed of record in the

official indices of Lessees and Lessors. The failure to re-acknowledge was not apparent from the instrument. Since the purpose of proper recordation is to give notice of encumbrances, it is difficult to see how the Trustee was in any way prejudiced—even if a technical violation could be found.

■ Further, the failure to re-acknowledge before a notary public was not evident on the face of the recorded Lease; nor was it evident that three pages had been inserted subsequent to proper acknowledgment. The majority rule is that a latent defect in the acknowledgment of an instrument required for recordation does not prevent the recordation from affording constructive notice to persons who may be affected by the transaction recorded. *See* Annotation, 59 A.L.R.2d § 25, at p. 1316; 1 C.J.S. Acknowledgments § 18, at p. 799. None of the alterations of previously acknowledged documents in the cases cited by the Trustee were nearly as trivial or in so full compliance with proper formalities as the Lease in the present case.

■ The Trustee's contention must fail for yet another reason. An admittedly improperly recorded instrument is not void as to a creditor or subsequent purchaser for value unless that person was "without notice" of the instrument. Ariz.Rev.Stat. § 33–411(A). The district court found that the Trustee was put on inquiry notice with respect to the Wonderfair-Walgreen Lease. We agree.

■ Throughout the period in issue (several years), a 35-foot sign stating that Walgreen was a tenant of the East Gate Shopping Center was conspicuously situated on the property in question. This sign should have been "sufficient to excite the attention of a person of ordinary prudence" to make further inquiry as to possible encumbrance of the property. 45 Am.Jur. Records § 133, at p. 498. *See* Davis v. Kleindienst, 64 Ariz. 251, 258–259, 169 P.2d 78, 83 (1946).

Had the Trustee so investigated he would have discovered not only the Lease, but also the Walgreen Guaranty

and Wonderbowl-Downey Agreement, both properly recorded therewith. There is no question but that these documents together (two recorded, one unrecorded (defective)) would have provided unequivocal notice of Walgreen's interest. *See, e. g.,* Barringer v. Lilley, 96 F.2d 607 (9 Cir. 1938); Phoenix Title and Trust Co. v. Stewart, 337 F.2d 978, 984 (9 Cir. 1964). There is in the present case at least as strong a basis for holding that signs constitute a recognized means of asserting a possessory claim to property thus requiring further inquiry, as there was in Natural Resources, Inc. v. Wineberg, 349 F.2d 685, 690 (9 Cir. 1965).

The district court's order is affirmed.

### Appeal No. 73–2055

This is an appeal from the Order of the District Court for the District of Arizona, denying plaintiff Walgreen Arizona Drug Co.'s ("Walgreen's") motion for summary judgment and granting defendants Mary Ann Levitt, et al.'s ("the Levitts' ") motion for summary judgment. With minor exceptions, not here controlling, the controversy involves the validity of the same Lease which we upheld in Appeal No. 73–1712.

The Trustee in bankruptcy, Sam Jonas, sold the property in question to the Levitts, subject to any encumbrances. In Appeal No. 73–1712, the District Court for the Central District of California held that the Lease between Wonderfair and Walgreen was a valid transfer of a leasehold estate and had priority over the interest of the Trustee. We affirmed that decision. In the present case, the District Court for the District of Arizona held that the same agreement did not give Walgreen priority over the Levitts, who purchased the land from the Trustee.

For the reasons stated in our affirmance in Appeal No. 73–1712, *supra,* we reverse the decision of the district court below and remand with instructions that the court enter an order for summary judgment against the Levitts and in favor of Walgreen.