BORTON et ux, *Respondents,*

`v.`

MEDICINE ROCK LAND COMPANY, *Respondent,*

LA RO LUMBER COMPANY, INC. et al, *Appellants.*

549 P2d 1122

*Douglas B. Dawson,* Dallas, argued the cause and filed briefs for appellants La Ro Lumber Company, Inc., and R. L. Praegitzer.

*Paul Gerhardt,* Portland, argued the cause and filed a brief for respondent Medicine Rock Land Company.

*James W. Walton,* Corvallis, argued the cause for respondents Robert A. Borton and Clara Borton. With him on the brief was Ringo, Walton & Eves, Corvallis.

BRYSON, J.

## BRYSON, J.

Defendants La Ro Lumber Co. and Robert Praegitzer[1] appeal from a decree of the trial court which denied them ownership of certain timber and awarded damages against them for breach of contract.

Plaintiffs, Mr. and Mrs. Robert Borton, were in the logging business and owned timbered property in Lincoln County. On April 28, 1972, the Bortons sold approximately 293 acres of timberland to Medicine Rock Land Co. (hereinafter Medicine Rock).[2] The Bortons, however, reserved ownership of certain trees on the tract:

> "RESERVATION OF CERTAIN TREES. It is understood that the Seller [Bortons] reserves ownership of *sixty old growth douglas fir trees* now standing on the premises. The Seller shall have the right to remove said trees at any reasonable time, and upon full payment of the purchase price and delivery of the deed to the Purchaser the Seller shall remove said trees upon 180 days' written notice from the Purchaser." (Emphasis added.)

Medicine Rock paid the Bortons $50,000 and intended to satisfy the remainder of the purchase price, $130,000, by selling the timber on the parcel. However, Medicine Rock's initial logging efforts were unsuccessful and by December, 1972, the Bortons were threatening foreclosure.

In late February, 1973, Medicine Rock obtained loans totaling $137,000 from Dant & Russell (D & R) and the United States National Bank of Oregon (US Bank).[3] Thereafter, D & R, Robert Praegitzer, who did

---

[1] For purposes of this appeal, La Ro Lumber Co. and Robert Praegitzer are one entity.

[2] Medicine Rock was owned by Mr. and Mrs. Jeffrey Lagge and had been organized for the purpose of purchasing this parcel. Jeffrey Lagge died in September, 1973, and Mrs. Lagge became sole owner of Medicine Rock.

[3] D & R loaned Medicine Rock $50,000 in exchange for a promissory note which was secured by a timber deed and security agreement. US Bank loaned Medicine Rock $87,000 in exchange for a promissory note which was secured by a mortgage and personal guarantees. Both notes were due on September 15, 1973.

business as the La Ro Lumber Co. (hereinafter La Ro), and Medicine Rock contemporaneously executed separate but related contracts for the repayment of Medicine Rock's loans:

1. D & R purchased[4] Medicine Rock's merchantable conifer timber, delivery to be not later than September 15, 1973.

2. La Ro was hired by Medicine Rock to log and to deliver the above timber to D & R by September 15, 1973.

3. D & R agreed to distribute the proceeds from the timber in designated percentages to D & R, La Ro, and US Bank. The excess, if any, would be disbursed to Medicine Rock.

However, Medicine Rock needed additional capital so it granted La Ro all rights to the "overrun," *i.e.,* "[a]ny and all merchantable timber on said premises not subject to a prior right of removal by BORTON," for the sum of $25,000.[5] La Ro was to remove the overrun by September 13, 1974, or forfeit all rights thereto "unless the parties should * * * agree in writing to an extension of time."

Having obtained the necessary capital, Medicine Rock paid the Bortons and received a warranty deed to the 293-acre tract. The deed, which did not contain the Bortons' reservation of 60 trees, was recorded on March 2, 1973.

When the Bortons entered the premises to remove their 60 trees in the summer of 1973, La Ro demanded

---

[4]The Bortons' sixty trees were excepted from the sale. Also, Medicine Rock and D & R believed that the Bortons would forfeit their trees if the Bortons failed to remove the trees after receiving 180 days' written notice. Therefore, it was agreed that Medicine Rock would immediately give the Bortons notice, and D & R agreed to purchase all trees which the Bortons might forfeit.

[5]La Ro knew that the term "old growth" has several meanings in the logging industry and, further, that there were few, if any, trees on the 293-acre tract which met La Ro's definition of "old growth douglas fir." In short, La Ro saw a potential windfall and hoped to acquire 60 conifers, worth approximately $36,000, and alder, worth approximately $133,000, for $25,000.

that they "cease and desist these actions" and threatened immediate "legal action." It was La Ro's opinion that there were no "old growth douglas fir" on the premises, and, therefore, the Bortons had no interest in any of the trees. At this time, all of the parties herein agreed that the various contracts be extended one year.

On May 22, 1974, the Bortons commenced this suit to reform the deed of March 2, 1973, and to obtain a declaration of their rights under the reformed deed. Bortons, Medicine Rock, and La Ro stipulated that the deed should be reformed. But La Ro filed a counterclaim alleging that the term "old growth douglas fir," as used in the deed as reformed, was ambiguous, at least as far as La Ro was concerned, and sought a declaration of the parties' interests in all of the *timber* on the premises. Medicine Rock made no claim to the *timber.* Neither D & R nor US Bank made appearances. No timber has been removed from the premises to date. There is no dispute regarding title to the *land.*

The trial court ordered that the deed be reformed by adding the Bortons' reservation covering the "sixty old growth douglas fir trees." The trial court also found that the term "old growth douglas fir" "was used by the parties * * * to differentiate older from younger trees and not as a technical term," and that the Bortons "are the owners of 60 Douglas fir trees which now stand and are marked on the premises." The trial court further decreed that La Ro had "no right, title or interest in the subject property."

La Ro appeals from the trial court's decree and presents numerous assignments of error. The first group of errors assigned by La Ro involve the scope of the Bortons' reservation. We review de novo.

In order to ascertain the meaning of the term "old growth douglas fir," we consider all of the circumstances surrounding the Bortons' sale and conveyance of the 293-acre parcel to Medicine Rock. *Wirostek v.*

*Johnson,* 266 Or 72, 75, 511 P2d 373 (1973); *Whittle v. Wolff,* 249 Or 217, 221, 437 P2d 114 (1968); *Belton v. Buesing,* 240 Or 399, 408, 402 P2d 98 (1965).

The record shows that after the Bortons had sold the property in question to Medicine Rock, Robert Borton went onto the property and marked 60 trees with paint. Robert Borton also testified that his intent was to reserve the 60 "larger" trees on the property. Buddy Russell, a logging foreman, and John Holden, Jr., president of Medicine Rock in 1972, both observed "larger" trees marked with paint when they toured the premises in the spring of 1972.

Buddy Russell testified that he saw "fifty or sixty" trees marked with paint. John Holden testified that prior to the execution of the contract of sale in April, 1972, Borton "knew every tree and he knew exactly which one we were discussing." Similarly, Bert Udell, a forestry engineer, toured the same area in 1975 and observed several "large" trees marked with paint in a natural stand. Furthermore, Udell testifed that these trees could be called "old growth douglas fir."

Also, La Ro admits that it was aware of the terms of the Medicine Rock-D & R contract which was executed on February 28, 1973. Exhibit "D" of that contract states that the 60 reserved trees were "marked." Furthermore, the attorney present when Medicine Rock and La Ro executed the logging contract and the overrun sale contract testified that Jeffrey Lagge, now deceased, did not seriously question the scope of the Bortons' reservation. For this reason, Medicine Rock obtained a promise from La Ro to indemnify Medicine Rock in the event that La Ro removed any of the Bortons' 60 reserved trees.

We reach the same conclusion as the trial court. The evidence clearly establishes that the term "old growth douglas fir" was used to refer to the older,

larger Douglas fir trees now standing on the premises which have been marked with paint.[6]

The issue in this portion of the appeal is whether La Ro, a purchaser with notice, *see Willis v. Stager,* 257 Or 608, 615, 617, 481 P2d 78 (1971); *Schroeder et ux v. Toedtmeier et al,* 184 Or 561, 581-82, 200 P2d 606 (1948), can defeat the Bortons' prior claim to the 60 trees. The law is well settled that a purchaser with notice of a prior right takes subject to that right. *Seguin et al v. Maloney-Chambers,* 198 Or 272, 285, 253 P2d 252 (1953). We find that La Ro had notice of the reservation and we reach the same conclusion as the trial court.

We now turn to the second group of assigned errors. Under ORS 16.315, Medicine Rock filed a cross-claim against La Ro to recover damages caused by La Ro's alleged failure to perform the logging contract.[7] As an affirmative defense, La Ro alleged that Medicine Rock prevented La Ro's performance of the logging contract. La Ro also filed a cross-claim against Medicine Rock to recover damages caused by Medicine Rock's alleged breach of both the logging and the overrun sale contracts. Alternatively, La Ro sought restitution of the $25,000 that it had "advanced" to Medicine Rock for the overrun.

The trial court dismissed La Ro's cross-claims and awarded Medicine Rock $29,840 plus interest and attorney fees. La Ro appeals from the dismissal of its cross-claims and the award of damages and attorney fees.

During trial, Medicine Rock took exception to the trial court's ruling that the cross-claims fell within the court's equitable jurisdiction. *See Allan & Leuthold,*

---

[6]We have examined the testimony of La Ro's witnesses who testified that the 60 trees may have been painted after this controversy arose. The testimony is not conclusive. The trial court was of the same opinion.

[7]In its brief, La Ro notes that Medicine Rock's cross-claim erroneously refers to the overrun contract. This is true. However, no objection was taken at trial, and there is no evidence that La Ro was prejudiced by this.

*Inc. v. Terra Investment Co.,* 271 Or 335, 532 P2d 218 (1975). However, we need not consider Medicine Rock's contentions because the cross-claims can be decided as a matter of law. *Cf. Lilenquist v. Pitchford's, Inc.,* 269 Or 339, 344, 525 P2d 93 (1974). Further, the pleadings are each labeled "Suit in Equity," and the parties pray for equitable relief.

■ La Ro first contends that Medicine Rock failed to prove that La Ro breached the logging contract as a matter of law. La Ro argues that it was forced to suspend its logging operations because (1) it was "impossible" to conduct logging operations while the Bortons' 60 trees remained on the premises, and (2) the Bortons were harassing La Ro with litigation in the spring of 1974.

The evidence conclusively shows that La Ro could have logged the area without injuring any of the Bortons' trees. Despite La Ro's assertions that Medicine Rock failed to notify the Bortons to remove their trees, there is no evidence that Medicine Rock's conduct actually interfered with or prevented La Ro's performance of the logging contract. Praegitzer testified:

"Q I'm asking you a question. Did Medicine Rock in any way interfere with your performance of the agreement?

"A I'd have to say no, I guess."

The evidence shows that Robert Borton was always willing to assist La Ro in identifying the 60 trees. However, La Ro not only refused such assistance, but invited the Bortons' suit.

"* * * [T]he supervening situation that is so described does not excuse a promisor from his contractual duty if he himself wilfully brought it about, or if he could have foreseen and avoided it by the exercise of reasonable diligence and efficiency. In such a case, the promised performance was not impossible in any sense * * *. [I]nstead, it was prevented by his own wilful or negligent conduct." 6 Corbin on Contracts 346-48, § 1329.

*See also Savage v. Peter Kiewit Sons',* 249 Or 147, 153, 432 P2d 519, 437 P2d 487 (1968).

■ La Ro next contends that the trial court applied the wrong measure of damages. This was not raised at trial. In any event, the pleadings and the evidence show that Medicine Rock sought to recover the consequential damages it sustained as a result of La Ro's nonperformance of the logging contract.

The record shows that La Ro knew that Medicine Rock had sold its timber to D & R in order to pay the outstanding notes of $87,000 and $50,000 owing to US Bank and D & R. When La Ro failed to deliver D & R's timber by September 15, 1974, Medicine Rock had no funds to pay the notes which fell due on September 15, 1974. Ultimately, Medicine Rock was forced to sell its remaining asset, the land, at a substantial loss in order to settle its financial affairs.

Since Medicine Rock's loss was within the contemplation of the parties and was directly caused by La Ro's misconduct, Medicine Rock was entitled to recover the amount of that loss, as established by the evidence. *See Senior Estates v. Bauman Homes,* 272 Or 577, 539 P2d 142 (1975); *Krause v. Bell Potato Chip Co.,* 149 Or 388, 394, 39 P2d 363 (1935); *Gordon v. Curtis Bros. et al,* 119 Or 55, 66-67, 248 P 158 (1926); McCormick, Law of Damages §§ 138-41 (1935).

■ Nonetheless, La Ro insists that Medicine Rock's sale was a sham.[8] We have carefully examined the record and can find no evidence to rebut Mrs. Lagge's testimony that the entire transaction was an "arms-length" deal.

Medicine Rock had previously tried to negotiate some kind of arrangement with at least three other

---

[8] At the suggestion of Gordon McKechnie, Mrs. Lagge's friend and advisor, Medicine Rock sold its land to Lag, Inc., as part of a proposal to get Medicine Rock out of debt. Lag, Inc., was organized to purchase the land and is equally owned by Mrs. Lagge and M & S Forest Products, Inc., a corporation that is partially owned by Gordon McKechnie.

parties. When these early proposals were rejected, Medicine Rock was in a "desparate situation" and "had to scramble" or face financial ruin. Mrs. Lagge testified:

> "A  * * * I was forced to sell in a position where I was between the Devil and the deep blue sea * * *.
>
> "* * * * *.
>
> "A  * * * I couldn't afford to go on another merry-go-round."

M & S Forest Products, Inc., helped Medicine Rock pay off the US Bank and D & R notes in September, 1974. The entire financial plan to rescue Medicine Rock, however, also contemplated the formation of Lag, Inc., and the transfer of Medicine Rock's land to Lag, Inc. When La Ro failed to log the trees as agreed, Medicine Rock had no income to repay its loans and no alternative but to accept the proposal offered by the directors of M & S Forest Products, Inc.

■  La Ro next contends that the trial court erred in allowing Gordon McKechnie to testify that the fair market value of the 293-acre tract in September, 1974, was $200 per acre. The record shows that McKechnie was a timber manager for many years and had investigated sales of timberlands in Lincoln County, and particularly in 1974. He also made inquiry from individuals in the "Timber Acquisition Department" of Boise-Cascade regarding land values for this particular "site quality" and type of property. He also checked land values and sales patterns for similar land in Lincoln County. We find there is no basis to this contention. The trial court could determine what weight he would give McKechnie's testimony.

■  La Ro next contends that the trial court erred in dismissing its second cross-claim for damages caused by Medicine Rock's alleged refusal "to continue * * * the La Ro Contracts."

The first of the "La Ro Contracts," the logging contract, expired on September 15, 1974. We have previously concluded that Medicine Rock did not breach this

logging contract. Further, there is nothing to indicate that Medicine Rock was obligated to "continue" the logging contract after September 15, 1974.

The second of the "La Ro Contracts," the overrun sale contract, expired on September 15, 1975, a few months after this case was tried. An examination of the documents shows that La Ro's rights to any overrun on the premises is dependent upon La Ro's complete performance of the logging contract. It follows that an extension of the overrun sale contract in this case would be meaningless because the related contracts have not been similarly extended. Thus, Medicine Rock was not obligated to "continue" the overrun sale contract.

La Ro next contends that the trial court erred in dismissing its first cross-claim for restitution of the $25,000 that it "advanced" to Medicine Rock as "an unsecured non-interest bearing loan."

The written agreement between Medicine Rock and La Ro for the sale of the overrun is unambiguous. As such, it presents a question of law for the court. *May v. Chicago Insurance Co.,* 260 Or 285, 292-93, 490 P2d 150 (1971); *Hekker v. Sabre Construction Co.,* 265 Or 552, 555, 510 P2d 347 (1973). In essence, La Ro purchased an expectancy, nothing more. Praegitzer so testified.

Finally, La Ro contends that the trial court erred in awarding Medicine Rock attorney fees because the logging contract, on which Medicine Rock based its cross-claim, does not provide for attorney fees. This is true. However, Medicine Rock was successful in its defense to La Ro's cross-claims, which are based on the overrun sale contract. The overrun sale contract provides that the prevailing party shall be entitled to recover reasonable attorney fees.

The parties stipulated that the trial court should determine what was reasonable attorney fees, and the

record shows that the trial court's award was reasonable.

The remaining issue concerns damages the trial court awarded Medicine Rock on its cross-claim against La Ro. There is evidence that Medicine Rock's loss was between $31,928.10 and $37,788.10. The consequential loss sustained by Medicine Rock is the discount it was forced to give Lag, Inc., for the sale of the land in September, 1974. The land was sold for $20,811.90 at a time when the fair market value of the land was $180 to $200 per acre. However, since Medicine Rock demanded only $29,840 as damages, the trial court awarded Medicine Rock the amount of its demand. The evidence shows a bona fide arms-length transaction occurred in the sale from Medicine Rock to Lag, Inc. We see no reason to disturb the trial court's award under these circumstances.

Affirmed.