NEWPORT TERMINALS, INC., *Respondent,*
*v.*
SUNSET TERMINALS, INC. et al, *Appellants.*
(TC 34962, SC 24524)
566 P2d 1181

James H. Clarke, Portland, argued the cause for appellants. With him on the briefs for Northwest Natural Gas Company were John P. Bledsoe, and Dezendorf, Spears, Lubersky & Campbell, Portland. Maynard Wilson, Cottage Grove, and James H. Lewelling, Newport, filed a brief for Sunset Terminals, Inc.

John E. Frohnmayer, Portland, argued the cause and filed a brief for respondent.

LENT, J.

## LENT, J.

Defendants appeal from a declaratory judgment. The trial court upheld a provision in a lease between plaintiff-lessee and defendants' predecessor in interest and held that the provision operates against defendants.

On February 16, 1967, Yaquina Bay Dock & Dredge Co., defendants' predecessor in interest, entered into a lease with plaintiff, Newport Terminals, Inc. The lease conveyed an interest in 22 acres of land with two existing docks on Yaquina Bay in the city of Newport and was for a term of 20 years. This land was part of a larger tract owned by Yaquina on the north shore of the bay. Newport Terminals uses the leased property to operate the docks. Users of the docks are primarily exporters of log and paper products.

Contemporaneously, Newport's parent company (Brady-Hamilton) advanced funds for the construction of a dike on Yaquina's land which was south of the leased property. This was necessary to salvage dredgings from operations being conducted by the Army Corps of Engineers. New landfill was thereby created which increased the amount of Yaquina's land suitable for industrial use. The loans for this development were later repaid.

The present dispute concerns the interpretation of paragraph 6 of the lease:

"6. This lease shall extend to any additional dock or warehouse facilities which may hereafter be developed for use in the loading or unloading of deep water ships or barges upon land or property now owned by Lessor in Lincoln County, Oregon, whether then held by Lessor or its successors or assigns, and this covenant shall run with the land."

In 1968 Yaquina was dissolved, and its property passed to Sunset Terminals, Inc. In 1974 defendant Northwest Natural Gas Company purchased 20 acres

of waterfront property from Sunset. This parcel was part of the land held by Yaquina in 1967 and included much of the landfill development. Northwest intends to construct a dock and receiving facility to import and store liquefied natural gas on this site. At issue is whether Newport Terminals will have some right in this facility upon its completion by operation of paragraph 6 of the lease.

Newport filed this proceeding for a declaratory judgment in April 1974, seeking a declaration of its rights under the lease. Northwest by affirmative defenses asserted that: (1) the lease covenant did not run with the land and bind successors of the original lessor; (2) the agreement to lease is vague and indefinite and therefore unenforceable; (3) the provision operates as an unreasonable restraint of trade in violation of Section 1 of the Sherman Act; and (4) plaintiff and its parent company intended by the provision to monopolize the port facilities in Newport and that the provision is void under Section 2 of the Sherman Act as an attempt to monopolize. Other affirmative defenses raised are no longer at issue. Sunset pleaded the same defenses.

After a trial, the circuit court entered findings and conclusions, and a judgment declaring that the lease provision is:

"* * * valid, subsisting, enforceable and binding upon the defendants and plaintiff herein in accordance with its terms as to any dock or warehouse facility developed after February 16, 1967 for use in the loading or unloading of deep water ships or barges * * *"

and that Northwest's land is subject to its terms.

In its appeal Northwest renews its four arguments against the lease. Sunset contends that the lease, construed as a whole, should not apply by its terms to Northwest's proposed facility.[1]

---

[1] Appellants conceded at oral argument that no finding of fact by the trial judge had been assigned as error and that all issues were purely legal. We, therefore, do not review the trial court's findings of fact.

*Enforceability of the Lease Provision Against Northwest*

Paragraph 6 of the lease can be construed as either an agreement to make a lease or as a present demise with the right of possession to begin in the future upon erection of a warehouse or dock facility for deep water ships. As has been recognized:

> "A contract to make a lease of realty differs from a lease of realty in nature, effects and consequences, much as a contract to sell realty does from a conveyance of realty. Whether a writing constitutes a contract to lease or a lease is a matter of the real intention of the parties. Language which almost always would import a present demise may be found in light of the context and surrounding circumstances to constitute a personal contract to thereafter make a lease. On the other hand, language which almost always would be understood as a promise later to make a lease has been construed as constituting words of present demise, that is to say, a lease. * * * A writing may be a lease though it does not give a right to immediate possession since a lease for years may create an estate to commence in futuro. 1 Tiffany, Landlord and Tenant, §§ 62 and 63 (1912); 1 American Law of Property, § 3.17 (Casner ed. 1952); 51 C.J.S., Landlord and Tenant, §§ 184 and 185; 32 Am. Jur., Landlord and Tenant, § 28." *Motels of Maryland, Inc. v. Baltimore County,* 244 Md 306, 223 A2d 609, 612 (1966).

In *Wright v. Baumann,* 239 Or 410, 398 P2d 119 (1965), the distinction between an agreement to make a lease and a lease was recognized. As noted in *Wright,* the intent as shown in the agreement is one of the primary criteria for differentiating between the two types of agreements. (239 Or at 416, n. 8.) There the contract was to lease an office in a building to be constructed by the lessor.

We said:

> "* * * Conceding that one may make a present demise of a term to begin in the future, it is difficult to conceive of the present transfer of the title (or a part of it in the case of a lease) when that which is to be

transferred has no existence." (footnotes omitted.) (239 Or at 416.)[2]

Here the lessee's rights are contingent upon a future event, the erection of port facilities. Under the rationale of *Baumann,* it would seem that no present transfer was intended. On the other hand, it is suggested in *Riedel v. Plymouth Redevelopment Authority,* 354 Mass 664, 241 NE2d 852, 853 (Mass 1968), that:

> "Whether an instrument is a lease or an agreement for a lease depends on the intention of the parties to the instrument as ascertained from the instrument as a whole. [Citing cases.] The determination is whether 'the instrument, upon its face, purports to be the contract upon which the occupation is to be enjoyed, and the relations and rights of the parties to be defined, and it contains apt words to operate as a present demise.' [Citing cases.]"

The instrument in question here does "purport to be the contract upon which the occupation is to be enjoyed." ("*This lease* shall extend * * *.") Rent payments are calculated in the lease under a percentage of gross income formula.[3] This calculation can be readily applied to additional income-producing properties. The

---

[2]Similarly, in *Target Stores, Inc. v. Twin Plaza Co.,* 277 Minn 481, 153 NW2d 832 (1967), it was held that, "The fact that a document covers a building yet to be constructed implies that the transaction is at most an agreement to lease rather than a lease * * *." 153 NW2d at 840. On the other hand, contracts to lease in future upon completion of a building have been held to be present leases. *See In re Wonderfair Stores, Inc. of Arizona,* 511 F2d 1206 (9th Cir 1975).

[3]The lease provides that:

"1. Lessee shall pay or cause to be paid to Lessor as rental for the leased premises the following amounts:

"(a) 10 per cent of the gross income realized from the operation of the leased facilities up to and including the first $100,000 of such receipts for each year of the lease term * * *, and

"(b) One-third of the gross income realized from the operation of the leased facilities in excess of the aforesaid $100,000 of such receipts for each year of the lease term * * *, and

"(c) Commencing on February 7, 1972, and on each 7th day of February thereafter to and including February 7, 1986, the additional sum of $5,000."

[ 98 ]

other key elements of a lease, description of the property and the duration of the term[4] are likewise certain as to additional property to be let. The property covered is that owned by Yaquina in Lincoln County as of February 16, 1967, upon which port facilities are developed.[5] The term of the lease expires on February 28, 1987. This agreement is either a present leasehold conveyance or a contract to lease. Regardless of its denomination, its terms are binding upon successors to the lessor, including Northwest. Characterized as a present transfer, the lessor would have only a reversionary interest in the land. A successor to the lessor would hold that reversion but no more and would take subject to the lease.[6]

On the other hand, if the provision operates as an agreement to lease, it conveys an equitable interest in the land to Newport. In *Motels of Maryland, Inc. v. Baltimore County, supra,* the court noted:

> "That equity treats a contract of sale of real estate as transferring an equitable estate or interest to the vendee, leaving the vendor the holder of the bare legal title, is firmly established in Maryland. [Citing cases.] It is equally firmly established of course that equity ordinarily will transform the equitable interest of a vendee into a legal estate by granting specific performance of the contract to sell and convey. [Citing cases.]

> "That a contract to convey a lesser estate than a fee creates an equitable interest which equity ordinarily will transform into an equivalent legal estate seems logically inescapable."

---

[4] In *Marastoni v. Lucey,* 268 Or 433, 440, 521 P2d 521 (1974), it was held: "There are three essential elements of a lease: a description of the property, the duration of the term, and the rental consideration." *Accord, Karamanos v. Hamm,* 267 Or 1, 4, 513 P2d 761 (1973); *Bevan v. Templeman,* 145 Or 279, 289, 26 P2d 775 (1933).

[5] The evidence discloses that in Lincoln County Yaquina owned only the waterfront property in Newport and a small upriver parcel which was not suited for deep water facilities.

[6] *Jack Mathis Gen. Contr. v. Murphy,* 256 Or 233, 472 P2d 820 (1970); 1 American Law of Property 307, § 3.59 (1952): "A transferee of the reversion who is a purchaser for value still takes subject to the lease if he has actual or constructive notice of it."

Quoting from Williston on Contracts, § 945, the court concluded:

" 'It is also true, though it is not clearly admitted in the cases, that a contract to make a lease should stand on the same footing as a contract to convey a freehold estate. If one who contracts to purchase a fee immediately becomes owner thereof in equity, one who contracts for the conveyance of a lesser estate should become the owner in equity of that estate.' " (223 A2d at 613, 614.)

In Oregon the vendee of a contract to convey real property is the holder of an equitable interest in the land, and a purchaser with notice of this equitable right takes subject to it. *Bloech v. Hyland Homes Co. et al,* 128 Or 292, 300, 274 P 318 (1929). An agreement to lease likewise creates an equitable interest in real property. *Cf., Wallace v. Scoggins,* 18 Or 502, 21 P 558 (1889). Construing this provision as an agreement to lease to Newport which created an equitable property interest in the remaining land of the lessor, it follows that Northwest, as a purchaser with notice of this prior right,[7] takes subject to this interest. "[T]he person who purchases an estate, although for a valuable consideration, after notice of a prior equitable right, makes himself a *mala fide* purchaser and will not be enabled, by getting in the legal estate, to defeat such prior equitable interest, * * *." *Bohlman v. Coffin,* 4 Or 313, 317 (1873). *See also Borton v. Medicine Rock Land Co.,* 275 Or 59, 65, 549 P2d 1122 (1976), and cases cited therein. Therefore, we conclude that paragraph 6 of the lease operates against Northwest Natural Gas.

Sunset contends that the language of paragraph 6, which extends the lease to "*any* additional dock or warehouse facilities" (including both "public" and "private" docks) is inconsistent with the provisions of

---

[7]Northwest admitted during the trial that at the time it purchased the property from Sunset, it was aware of the lease provisions. The trial court also found in its findings of fact that: "Defendant Northwest knew of paragraph 6 in the lease between Newport and Yaquina prior to receiving a deed and completing the purchase of property from Sunset in March, 1974."

[ 100 ]

paragraph 4, which provide that: "Lessee will operate the leased facilities as a *public dock* and related facilities in accordance with the provisions of applicable law * * *." (Emphasis supplied.) Because this inconsistency creates an ambiguity, Sunset relies on parol evidence to show that the intent of the parties was to restrict only competing public docks and warehouses. Since Northwest's facility (characterized by Sunset as "private") is for the importing of natural gas for its own use, it does not compete with Newport's use of its present facility for export operations (characterized as "public"). Sunset concludes, therefore, that the lease is not to be extended to include Northwest's operations. But, assuming that resort to parol evidence is required, the evidence shows Sunset's conclusion as to intent to be incomplete.

At the time of the lease negotiations in 1967, as noted above, the Army Corps of Engineers was planning to dredge Yaquina Bay. Yaquina Bay Dock and Dredge Company was anxious to salvage the spoils for landfill but was unable to do so for lack of funds. Newport's parent company, Brady-Hamilton Stevedore Co., loaned Yaquina $75,000 to build a revetment to contain the dredging spoils and create a new fill area. Part of the consideration involved in the loan was the execution of the lease with paragraph 6, and Newport was organized to operate the docks as lessee. The loan was eventually repaid by Yaquina's successor, Sunset.

In 1969 and 1970 additional dredging was done. Newport deepened one of its leased berths, and the spoils were deposited on the new landfill property. The cost for this dredging, $80,000, was shared equally by Newport and Sunset.

The court below, in its findings of fact, found that:

"Brady-Hamilton Stevedore Company and Newport Terminals would not have entered into the lease * * * if the lease had not been extended, through the provisions of Paragraph 6, to the land to be enclosed by the dike."

and that:

> "At the time of the lease in 1967 Newport Terminals anticipated future expansion onto the land behind the dike * * *."

There is evidence which supports each of these findings. Mr. Kennedy, the president of Newport, testified:

> "Q. Did Newport Terminals then provide the money for the construction of the dike?
>
> "A. Yes.
>
> "Q. And was there some benefit to Newport Terminals in having this dike there?
>
> "A. Well, there was going to be substantial new areas developed along the waterfront, and we felt that if this came to pass, why there was a possibility of developing other waterborne commerce that would blend into the operation of the existing dock.
>
> "Q. You anticipated, then, at that time that there might be future commerce off the land that was behind the revetment?
>
> "A. That's what we had in mind.
>
> "Q. * * * Did you anticipate at the time of the lease that a dock or facility might be built on this land behind the dike which was constructed?
>
> "A. There was always that possibility.
>
> "Q. And did you expect at that time that if in fact such development occurred it would be subject to your lease under the provisions of Section six?
>
> "A. Yes.
>
> "Q. Would you have advanced the money to build the dike if paragraph 6 were not in the lease?
>
> "A. I doubt very much we would."

Paragraph 6 of the lease, then, served a dual function: protection of the existing facilities leased by Newport from competitive docks during the term of the lease, as well as operating as an investment device in noncompetitive dock and warehouse operations. To confine its application only to "public" or competing docks, as Sunset urges, would ignore its investment function. For this reason, it should be applied as

written notwithstanding any ambiguity raised by the provisions of paragraph 4.

■ We also conclude that the provision is not too vague or indefinite to enforce. As discussed previously, the essential provisions governing rent, duration of the term, and the premises to be conveyed are certain.[8] Additional revenue generated by tariffs from use of additional dock facilities would be combined with income from Newport's present operations. Computation of the rent from this figure can be made according to the percentage rental provisions.

Northwest points out that the lease provides that Newport "shall not be required to make payment of rental to more than one person at one place." Northwest suggests if it develops dock and warehouse facilities on its purchased land and the lease provision allows Newport a leasehold interest in such property, it will receive no rental payment for the use of its investment; payment will be made to Sunset. Such matters, however, should not defeat Newport's interest. They are more properly considerations to be governed by a rental division agreement between Northwest and Sunset as part of Sunset's sale of its interest in the property.

*Anti-Trust Defense—Sherman Act, § 1*

■ The remaining issues involve the legality of Newport's interest in this land tested by standards which have evolved under the Sherman Act.[9] Northwest contends that paragraph 6 of the lease operates to

---

[8] *See* n.4, *supra.*

[9] Under 28 USC § 1337, Federal district courts are granted original jurisdiction of any civil proceeding "arising under any Act of Congress * * * protecting trade or commerce against restraints and monopolies." *See also* 15 USC § 15, allowing private suits in Federal district courts for antitrust violations. However, it has been recognized that a defendant can raise in state court a Federal antitrust defense to a breach of contract action. *Butler Enterprises v. Vanlandingham,* 264 Or 414, 424, 505 P2d 1149 (1973). *See also* 1A Moore's Federal Practice 2325, ¶0.208[4] (1974) and Note, "Exclusive Jurisdiction of the Federal Courts in Private Civil Actions," 70 Harv L Rev 509 (1957), and cases cited therein.

restrict development on the property subject to its provisions. Because of this, it is argued that Newport has violated Section One of the Sherman Act, which provides:

> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal * * *." 15 USC § 1.

Northwest contends that, because of zoning, the only property available for additional dock and warehouse facilities is Sunset's property acquired from Yaquina. The trial court found that:

> "Under present County zoning regulations, the only land bordering Yaquina Bay which can be developed for deep water dock facilities is property which was owned by Yaquina on February 16, 1967. Said property includes the property leased by Newport from Yaquina and the property purchased by Sunset in August, 1970, including the property sold by Sunset to Northwest on March 28, 1974."

Northwest submits that the effect of the lease provision "has been to foreclose substantial and necessary facilities on the bay that are necessary for the development of the community, facilities Newport is unwilling to invest in itself, but which cannot be built economically by others for Newport to operate." Thus, it concludes that the provision operates as an undue restraint on commerce.

The trial court concluded that:

> "Defendants failed to prove that paragraph 6 of the lease unreasonably restrains trade in interstate and foreign commerce in any way. Defendants further failed to prove that the lease between Newport and Yaquina and its successors in any way violates section one of the Sherman Act."

We agree.

To show a violation of Section One, it is necessary to establish: (1) a contract, combination or conspiracy; (2) a restraint of interstate or foreign trade or commerce; (3) an undue restraint on competition sufficient to

amount to a prohibited act. The purpose of Section One is to limit:

"* * * as illegal all contracts or acts which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract or act or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into or performed with the legitimate purpose of reasonably forwarding personal interest and developing trade, * * *." *Standard Oil Co. v. United States,* 221 US 1, 58 (1911).

It is not enough that the conduct restrain trade; only conduct which unreasonably limits competition is proscribed. Section One is construed with reference to the "Rule of Reason," which is described as follows:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is so not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences." *Chicago Board of Trade v. United States,* 246 US 231, 238 (1918).

Although not limited by common-law standards, traditional notions of what constitutes restraint of trade play a key part in identifying conduct made illegal under Section One. As was held in *Standard Oil:*

"Thus not specifying but undubitably contemplating and requiring a standard, it follows that it was intended that the *standard of reason* which had been applied at the common law and in this country in dealing with

subjects of the character embraced by the statute, was intended to be the measure used for the purpose of determining whether in a given case a particular act had or had not brought about the wrong against which the statute provided." (Emphasis added) 221 US at 60.

Conceding that the lease provision operates as a "contract," we believe Northwest has failed to show that the provision operates as an undue restraint of trade.[10] The record fails to show the relevant market in which trade is restrained as well as the extent, if any, of such a restraint. Moreover, even if it is assumed that the provision has some anticompetitive effects, such a restriction appears reasonable in light of its purpose.

At the outset, it is unclear what is being hampered by this provision. By its terms it does not prohibit the development of any commercial enterprise on the covered property. It acts only to require the lessee to operate a certain type of facility (deep water ship docks or warehouses) in the event of such construction. In exchange for this, the lessee is obligated to pay a percentage of the gross income from the facility to the lessor and to pay for operating expenses. What is restrained then by the terms of the clause is not trade in any particular product or service but the ability of owners of this property to operate their own port facilities by themselves.

Northwest argues that only if owners are allowed to operate newly constructed port facilities will such construction take place. It submits that even if trade is

---

[10]There has been no showing that the operation of the lease provision would allow Newport to set monopolistic fees for the use of its docks. By the terms of the lease, the lessee is to "maintain in effect tariffs which are comparable to and competitive with such tariffs from time to time in effect in other parts of the southwestern coast of Oregon." Moreover, the amount of tariffs appear to be regulated by the Federal Maritime Commission. Newport has received approval of a tariff for petroleum products including natural gas.

It appears, then, that the restraint at issue is limiting the entry of competitors to Newport in the operation of docks and warehouses for deep water ships.

not restrained by the terms of paragraph 6, the *effect* of the provision is to deter both competitive and noncompetitive dock operations. Northwest failed to show that the lease provision operated in the past to inhibit the development of any facility in direct competition with Newport (log, paper and plywood export facilities). Assuming, however, that the practical effect of the lease was to deter the construction of a competing dock operation, and is to be tested as if it explicitly precluded competitive uses of the lessor's property, even such a restraint would appear reasonable under the circumstances.

Tested under the "standard of reason which had been applied at common law and in this country" for noncompetition agreements, the assumed restraint on competition is reasonable. *See Standard Oil, supra.* In *Eldridge v. Johnston,* 195 Or 379, 245 P2d 239 (1952), it was held that:

> "It is elementary that contracts in general restraint of trade are void and unenforceable. But it is equally well settled that contracts in partial restraint of trade may be enforceable. [citing cases]
>
> "Three things are essential to the validity of a contract in restraint of trade: (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public." 195 Or at 403.[11]

---

[11] In the same case it was noted, "Whether or not the restriction as to time and territorial extent is reasonable must be judged from the standpoint of the time and place when and where the contract is executed, and from the general nature of the business involved." (195 Or at 408.) Similarly, Restatement of Contracts 2d (Tent. Draft May 12, 1977) § 328 at 104, *comment a,* concludes that: "Whether a restraint is reasonable is determined in light of the circumstances of the transaction, including not only the particular facts but general social and economic conditions as well. The promise is viewed in terms of the effects that it could have had and not merely what actually occurred. Account is taken of such factors as the protection that it affords for the promisee's legitimate interests, the hardship that it imposes on the promisor, and the likely injury to the public."

*Accord: North Pacific Lbr. v. Moore,* 275 Or 359, 364, 551 P2d 431 (1976); *Butler Enterprises v. Vanlandingham,* 264 Or 414, 427, 505 P2d 1149 (1973); *Lavey/Moore/Brown v. Edwards,* 264 Or 331, 338-39, 505 P2d 342 (1973); and *Mail-Well Envelope Co. v. Saley,* 262 Or 143, 497 P2d 364 (1972).

Viewed in this context, a covenant by the lessor to refrain from using retained property in competition with the lessee is reasonable if it is ancillary to the lease, is reasonably limited in time and space, is necessary to protect the value of the leasehold to the lessee, and does not unduly interfere with the interests of the public. In the present case, the covenant was a part of the main lease and was limited for a reasonable time to the property of the lessor in Lincoln County. Northwest failed to show either (1) that Newport's dock business would not be damaged by adjacent competitive facilities,[12] or (2) that the public greatly suffers by the unavailability of nearby competitive facilities.

In *Donahue v. Peterson,* 161 Or 65, 72, 87 P2d 770 (1939), we commented:

> "We think that one, who has leased property, may in order to protect the value to him of the use of the leased property impose a condition that the lessor will not during the terms of such lease engage in a business similar to that for which the lessee has procured the use of the leased premises; * * *."[13]

Such a resolution, however, does not completely end the inquiry under the Sherman Act. As was noted in *Schine Theatres v. United States,* 334 US 110, 119

---

[12] *Cf.* Restatement of Property 2d (Landlord and Tenant) § 7.2, *comment b* at 254 (1977): "The mere presence in a lease of a noncompetition promise by the landlord justifies the conclusion that it is essential that the promise be observed if the tenant is to conduct his business on the leased property profitably."

[13] For a review of the cases discussing the validity of covenants not to compete contained in leases under a common-law analysis, see Restatement of Property 2d (Landlord and Tenant) 256-257, Reporter's Note to § 7.2 (1977) and Annotation, 97 ALR2d 4 (1964).

(1948), in discussing covenants not to compete: "It is not enough that the agreements may be valid under local law. Even an otherwise lawful device may be used as a weapon in restraint of trade or in an effort to monopolize a part of trade or commerce." In the *Schine* case, the court inferred from additional monopolistic practices the requisite purpose to monopolize. Similarly, the court in *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 315 F Supp 45, 56 (SDNY 1970) held,

> "* * * [I]t is hornbook law that a covenant not to compete ancillary to the sale of a business (or part of a business), when reasonably limited as to time and territory, do not fall within the prohibitions of the Sherman Act. The question in every case is whether the restraint is reasonably calculated to protect the legitimate interests of the purchaser in what he has purchased, or whether it goes so far beyond what is necessary as to provide a basis for the inference that its real purpose is the fostering of monopoly."

*See also Sound Ship Building Corp. v. Bethlehem Steel Corp.,* 387 F Supp 252, 255 (DNJ 1975) *aff'd on other grounds* 533 F2d 96 (3rd Cir 1976), where in addition to the common law factors the court requires that "the restraint is neither imposed by a party with monopolistic power nor fosters a monopoly."

The background of the lease provision reveals no monopolistic purpose nor does the evidence show that it fosters a monopoly in the business of providing export facilities for wood products. At the time the lease was signed, alternative sites for such operations existed within the city of Newport. It cannot be said, then, that at that time Newport Terminals had monopolistic power, i.e., the ability to exclude competition. The inference we draw is that the purpose of the provision was protection of Newport's legitimate business interests. In light of the 20-year term of the lease and the liberal rent provisions, protection against competition on nearby land would appear reasonable.

Nor can it be said on this record that the operation of the restriction restrains trade by fostering a monopoly in wood products export facilities. The evidence

is insufficient for us to determine the relevant market. We do not know from the evidence whether any land is available in the ports of Astoria or Coos Bay for wood products export docks or whether such facilities could effectively compete with Newport's operations. Other market alternatives to exporting wood products, such as shipping facilities for domestic uses, may be within the area of effective competition. Without a showing of lack of market alternatives to Newport's services as well as the geographic area in which such services are offered, no conclusion can be drawn as to the monopolistic effect of foreclosure of competitive uses of nearby land.

A more difficult issue is presented by the effect of the lease on *noncompetitive* facilities. As discussed above, the provision does not explicitly restrict any *use* of the land but only the identity of the user for only two of several possible activities.

Northwest's proof that the past effect of the provision has been to totally eliminate certain noncompetitive uses was lacking. Two witnesses, however, testified as to the *potential* effect of the lease on future use of the land. An official of a forest products company testified that a feasibility study was being conducted for the construction of a wood chip loading plant on the restricted property. He opined that "* * * if we were to expend the amount of funds necessary to construct such a facility, then we would certainly have to operate it ourselves * * *."

His testimony was largely speculative. Some negotiations were being conducted with Newport Terminals for sharing the costs to develop the plant. According to this witness, whether the plant will be constructed depends upon the results of these negotiations, the possible rates to be charged, and other market factors being studied. We do not know from this evidence whether the lease provision by itself forecloses future development of a wood chip export facility.

It may be that the feasibility study will reveal that the lease provision operates as an incentive for the development of new businesses. The provision binds Newport to operate such facilities. ("This lease *shall* extend * * *.") Rent is required to be paid as a percentage of gross income. A developer could construct dock operations facilities such as a wood chip loading plant which might be only marginally successful or even unprofitable in the first years of operations. A return, based not on profits but income, would be assured. All operational expenses would be shouldered by Newport as a cost of the business. At the end of the term, the developer, if it owned the land, could take control of a now profitable business, paying nothing for good will. We do not suggest this situation as inevitable but only to show that Northwest's theory of the deterrent effect of the provision was based on conjecture and can be dispelled by plausible alternatives.

Even had Northwest shown that the existence of the provision prohibited a particular use, it would still be necessary to show that such a prohibition has an anticompetitive effect. There must be a showing that the restraint has, or is intended to have, an effect on prices in the market[14] or otherwise deprives purchasers or consumers of the advantages which they derive from free competition. *Apex Hosiery Company v. Leader Co.,* 310 US 469, 501 (1940). Any restraint imposed by the lease on noncompetitive uses gives no advantage to any particular competitor or user of the land but operates equally to affect all potential users. It has, then, *no effect on competition* within competitive classes of potential users.[15] It gives no advantage

---

[14]See n.10, *supra,* regarding lack of effect on prices or tariffs to shippers using the docks.

[15]The policy basis of the Sherman Act is to protect competition by rendering illegal those business arrangements which unfairly assist one competitor to the detriment of other competitors. It is aimed at "preserving free and unfettered competition as the rule of trade." *Northern Pac. Ry. v. United States,* 356 US 1, 4 (1958).

to Newport, a noncompetitor, and thus offends no policy of the Sherman Act.

Even if the restrained trade is generally characterized as "owner-operated port facilities," the proof of unreasonableness is lacking. In a sense, the lease provision is akin to an exclusive dealing arrangement. That is to say, the lessor grants to the lessee exclusive rights to operate any port facility on lessor's land. Viewing Northwest's position as that of a third party anxious to operate a dock, it could argue that the exclusive grant unreasonably foreclosed entry into the market of dock operations.

In *Tampa Electric Co. v. Nashville Co.,* 365 US 320 (1960), the Supreme Court reviewed the legality of exclusive dealing contracts in the context of § 3 of the Clayton Act.[16] It was held:

> "In practical application, even though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Following the guidelines of earlier decisions, certain considerations must be taken. *First,* the line of commerce, *i.e.,* the type of goods, wares, or merchandise, etc., involved must be determined * * *. *Second,* the area of effective competition in the known line of commerce must be charted by careful selection of the market area * * *.
>
> "*Third,* and last, the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited * * *.

---

[16]That section provides that "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods * * *, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, * * * of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

> "To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein." (365 US at 327-329.)

Although we do not deal here with alleged Clayton Act violations, a similar analysis would result from a Sherman Act perspective. To prevail in its defense Northwest must show the relevant line of commerce (operation of all owner-controlled dock or warehouse facilities or only deep-water ship docks or warehouses), the geographic area of competition (Oregon coast and Columbia River or Pacific Northwest coast or perhaps the entire western coast), and finally the competition foreclosed (which would depend upon the existence of market alternatives). In no way does the present record answer these questions.[17]

There is an additional factor which undercuts the restraint of trade analysis advanced by Northwest. Northwest's theory rests upon the uniqueness of this particular parcel for the development of port facilities. It contends that the land owned by Yaquina in 1967 and restricted by the lease is the only coast land available for 200 miles for marine port expansion (the distance between the ports of Coos Bay and Astoria). From this premise it argues restraint of trade and attempt to monopolize. But this condition was not so at the time the lease was signed. In 1967 there were other public docks in the Newport area. It was only after the city of Newport adopted a zoning plan in 1972 that the land in controversy became the only land available.

---

[17] Courts should be wary (particularly in antitrust cases) of granting the declaratory relief sought by a party whose record is incomplete and speculative. *Cf., White Motor Co. v. United States,* 372 US 253, 261 (1963). *See also Oregon Medical Assn. v. Rawls,* 276 Or 1101, 1108-1110, 557 P2d 664 (1976).

There was no evidence that Newport played any part in these zoning decisions.

Under any theory, then, if the lease provision restrained commerce it was only as a result of governmental actions. As was held in *Eastern R. Conf. v. Noerr Motors,* 365 US 127, 136 (1961), "Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out." *See also Parker v. Brown,* 317 US 341, 350-352 (1943); *United States v. Rock Royal Co-op,* 307 US 533 (1939).

Newport's present holding is a result of its contract with Yaquina. But the enhanced value of the restricted property for use as a facility for ship docks or warehouses is a result of historical accident and not the willful acquisition of monopoly power. *United States v. Grinnell Corp.,* 384 US 563, 570-571 (1966).

### Anti-Trust Defense—Sherman Act, § 2

Northwest finally contends that Newport and Brady-Hamilton, its parent company, intended by execution of the lease provision to monopolize the port facilities in Newport and that the provision is void under § 2 of the Sherman Act as an attempt to monopolize. We find this to be without merit.

Section 2 provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony * * *." 15 USC § 2.

At the time of the execution of the lease there were other public docks in the city of Newport. Even assuming that the relevant market is owner-operated port facilities in the city of Newport, the record fails to show that the execution of the lease was intended to create a monopoly. Yaquina's land was rendered the

only land suitable for port development and the holding thereby monopolistic only after the city of Newport enacted a zoning plan. This occurred five years after the execution of the lease.

It is essential to sustain a charge of an attempt to monopolize that a "specific intent; an intent which goes beyond the mere intent to do the act" be shown. *United States v. Aluminum Co. of America,* 148 F2d 416, 431-432 (2d Cir 1945). In *Times-Picayune v. United States,* 345 US 594, 626 (1953), the Supreme Court said: "While the completed offense of monopolization under § 2 demands only a general intent to do the act, 'for no monopolist monopolizes unconscious of what he is doing,' a specific intent to destroy competition or build monopoly is essential to guilt for the mere attempt now charged." *See generally,* Cooper, "Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two," 72 Mich L Rev 375 (1974).

We agree with the trial judge in his conclusion that "Defendants failed to prove that paragraph 6 of the lease * * * in any way violates Section Two of the Sherman Act."[18] In no way was specific intent shown nor can it be inferred from the present record. Accordingly, this defense fails.

Affirmed.

---

[18]Northwest additionally failed to show the relevant market in which Newport attempted a monopoly. There appears to be some dispute about whether proof of the relevant market is necessary to establish an attempt to monopolize. *See* American Bar Asso., *Antitrust Law Developments* 60-63 (1975). *Compare, United States v. E. I. du Pont de Nemours & Co.,* 351 US 377, 395 n. 23 (1956) *with Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 US 172, 177-178 (1965). One writer has commented, "For a time, it was uncertain whether attempt, combination, or conspiracy offenses under the Sherman Act required definition of the relevant market. The trend, however, has been toward a recognition that the anticompetitive effects of such offenses can only be ascertained by reference to an accurately defined market." Note, "Telek v. IBM: Defining the Relevant Market," 61 Iowa L Rev 184, 184-85 (1975). *See also Comment,* "Attempt to Monopolize Under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case," 73 Col L Rev 1451 (1973).