JACK W. RIZIKA[1] *vs.* JOHN J. DONOVAN & another.[2]

No. 96-P-1440.

Middlesex. January 29, 1998. - July 1, 1998.

Present: KASS, SMITH, & FLANNERY, JJ.

*Real Property,* Lease. *Contract,* Lease of real estate, Construction of contract, Condition precedent, Performance and breach. *Frauds, Statute of. Damages.*

A party may bind itself to lease property that it does not own or have under written agreement to buy, taking the risk of liability for damages to the tenant should it not acquire ownership of the leased premises by the time of the commencement date of the lease, and enforcement of such a lease agreement is not barred by the Statute of Frauds; accordingly, where prospective tenants repudiated such a lease agreement, they were liable for damages to the would-be lessor. [162-165]

In a civil action, the damage award returned by the jury was based on the evidence. [165-166]

CIVIL ACTION commenced in the Superior Court Department on October 18, 1993.

The case was tried before *Herman J. Smith, Jr.,* J.

*Ian Crawford* for the plaintiff.

*Thomas J. Dougherty* for the defendants.

KASS, J. On the ground that the contract between the parties lacked an essential term, a judge of the Superior Court, acting on a motion for judgment notwithstanding the verdict,[3] set aside a $4,844,912 jury verdict in favor of the plaintiff Rizika. The missing piece, the judge thought, was that Rizika, at the time he contracted with the defendants, did not own the real property he

---

[1]Individually and as trustee of the Rizika Realty Trust.

[2]Cambridge Technology Group, Inc.

[3]The somewhat ponderous caption placed by the defendants on their motion was "Defendants' Motion for Entry of Judgment in Favor of Defendants Based Upon Jurors' Answers to Special Questions." The trial judge properly treated the motion as one for judgment notwithstanding the verdict.

had agreed to lease to the defendants. We conclude that a party may bind itself to lease property that it does not own, taking the risk of liability for damages to the tenant should it not acquire ownership of the leased premises by the time of the commencement date of the lease. Accordingly, we reverse the judgment for the defendants.

*Facts.* During the relevant period, John J. Donovan was the controlling officer of Cambridge Technology Group, Inc. (CTG). Donovan's business connections with Rizika dated back to 1980, when Donovan, on behalf of his company — it was then called Advanced Information Systems and Services, Inc. — leased 219 Vassar Street, Cambridge, from Rizika.[4] Donovan rented additional space from Rizika in 1982 at 301 Vassar Street. Under the Vassar Street leases, Donovan had highly favorable options to buy the underlying fee-simple interest in the leased premises. By 1993, CTG needed more space. Rizika and Donovan met at Donovan's office on July 12, 1993. They identified a building numbered 600 Memorial Drive, Cambridge, as just the right fit for CTG. That property was owned by Gunwyn/600 Memorial Drive Limited Partnership and was thought to be for sale.

On the strength of the July 12th meeting, Rizika sounded out Massachusetts Institute of Technology (MIT) about the prospect of MIT acquiring 600 Memorial Drive and exchanging it with Rizika for the Vassar Street properties. The Vassar Street properties were well located for MIT's campus expansion plans, hence MIT's interest in a transaction that would wind up with it owning the Vassar Street properties. Rizika's interest in this circuitous method of acquiring 600 Memorial Drive was the income tax advantages to him from an exchange of property of like kind. MIT's response was encouraging.

Rizika got back to Donovan and from July 23, 1993, to July 27, 1993, there were negotiations between Rizika, on one side, and on the other side, Donovan, Donovan's son (John J. Donovan, Jr.), and Charles Stefanidakis, CTG's chief financial officer. On July 27, 1998, Donovan, Jr., and Stefanidakis, on behalf of the Donovan interests, and Rizika signed a document, written by Rizika, that bore the title, "Basic Terms of the Lease Agreement Between JJD and JWR" (the basic terms agreement). That

---

[4]The lease ran to Stephen Brown, trustee of a trust of which Donovan was sole beneficiary. Donovan guaranteed the trust's obligations as tenant. The trust subleased to Advanced Information Systems and Services, Inc.

document lays out, with conciseness and precision, agreement on the major economic issues, although the document lacks much of the peripheral detail that a lawyer would write into a lease. There was evidence, however, which the jury could have believed, that the parties proposed to write the business points they had agreed upon into a lease identical in form to the lease they had employed in the renting of the Vassar Street properties. See *Goren* v. *Royal Investments Inc.*, 25 Mass. App. Ct. 137, 141-142 (1987).

Included in the basic terms agreement[5] is a statement of the rent to be paid, $750,000 per year on triple net basis, with a rent escalator formula that begins to operate in the sixth lease year. Rizika was to retain 5,000 square feet on five floors, subject to an option by Donovan, which he might exercise after one and one-half years, to take over that space for an additional rent of $75,000 per year. Donovan was to have six months' occupancy rent free while he renovated the building. Rizika was to contribute $1,000,000 to the cost of renovation. Donovan would cause the trust he controlled to surrender its leases of 219 and 301 Vassar Street. That provision was crucial to Rizika's exchange of those properties with MIT. As to the term of the lease, Donovan could select such term as he required so long as it was at least ten years. Until July 1, 1998, Donovan could select which of two options he might have to acquire 600 Memorial Drive from Rizika. The first option provided for exercise by Donovan during the sixteenth lease year for two times its then market value. In the alternative, Rizika might "put" the property to Donovan for a price of 1.3 times its then existing market value. The second option formula would operate in the twelfth lease year and provided for three annual payments based on two times market value. Donovan was to have a right of first refusal or a right of second refusal if Rizika had given a right of first refusal to MIT as a term of acquiring 600 Memorial Drive.

Armed with the signed basic terms agreement, Rizika at once pursued the MIT segment of the transaction. MIT took steps

---

[5]The basic terms agreement never mentions 600 Memorial Drive but Donovan and CTG have never denied that this is the property which is the subject of the basic terms agreement. The trial judge, in his memorandum of decision, makes the same observations and concludes the omitted term can be supplied by implication since the basic terms agreement does refer to the amount of square feet to be leased and the number of floors, and includes a detailed purchase option.

toward the acquisition of 600 Memorial Drive[6] and prepared a short document to be signed by it, Rizika, and Donovan, memorializing the proposed property exchange. That document touched on CTG being allowed to continue to occupy the Vassar Street properties after MIT acquired them while renovations were being made to 600 Memorial Drive. Donovan declined to sign that three-party document, which Rizika had left for him on August 3, 1993. Rather, on August 4, 1993, Donovan (speaking through Donovan, Jr.) informed Rizika that he was not going through with the deal. Following that conversation, and that day, Donovan, Jr., wrote to Rizika demanding copies of any document committing Rizika to swapping the Vassar Street properties with MIT for 600 Memorial Drive and copies of any purchase and sale agreement involving MIT and 600 Memorial Drive. Donovan, Jr.'s, interest was not to be wondered at. He was by then engaged through a broker in an attempt to acquire 600 Memorial Drive directly.

In a letter of August 9, 1993, from Donovan, Jr., the "Dear Jack" of earlier correspondence became "Dear Mr. Rizika." There had been a meeting earlier that day and it had not been friendly. In his letter, Donovan, Jr., described the "term sheet" — his phrase for the basic terms agreement — as "merely that, an attempt to set forth preliminary terms . . . [i]t was not viewed or described by anyone as a final agreement." The letter chided Rizika with having no "legal interest whatsoever in 600 Memorial Drive . . . ." In another paragraph, Donovan, Jr., denies having had authority to "execute contracts" for CTG. He goes on to say that "we have no choice but to confirm that the 'term sheet' document is null, void, and of no further effect." Before he concludes his letter, Donovan, Jr., having earlier disavowed authority to act for his father and CTG, purports to exercise the Donovan purchase option rights on the Vassar Street properties. Rizika did not contest the manner in which the purchase option was exercised (Stefanidakis had cosigned the exercise of the option with Donovan, Jr.) — it would have been repairable — and an entity controlled by Donovan ultimately wound up with ownership of the Vassar Street properties.

*Whether the contract lacked an essential term.* Neither the

[6]On August 3, 1993, MIT sent to Gunwyn a draft of a purchase and sale agreement prepared by MIT's counsel. On August 4, 1993, Gunwyn replied to MIT with some comments about that draft and inquired whether the agreement could be signed that day.

briefs and arguments of the parties nor the judge seem to quarrel with the jury's finding that there was a "complete and binding contract between the parties." That is, there is no effort to argue that the basic terms agreement represented imperfect negotiations. The trial judge's reason for entering judgment notwithstanding the verdict, as he stated it, was that, "The essential term which was completely missing from the Contract was the condition that MIT fulfill an agreement with Rizika to swap 600 Memorial Drive, a building which MIT did not own at the time of the creation of the Contract [footnote omitted], for certain buildings which Rizika owned at the time." While that essential term may have been agreed upon, it was not contained in a document signed by the parties to be bound, notably, MIT, and, therefore, the judge concluded, enforcement of the agreement was barred by the Statute of Frauds. G. L. c. 259, § 1.

What the judge said, in effect, was that a party cannot enter into a binding lease for property which it does not own, even though the lease does not commence until a later date. We proceed to explore the correctness of that proposition. Certainly it is common in the trading of commodities and securities to contract to sell for an agreed price with delivery on a future date. The ability so to do underlies the strategem in those markets of "selling short." See, e.g., *John A. Franks Co.* v. *Bridges*, 337 Mass. 287, 289-290 (1958); G. L. c. 137, § 4. The question is whether the rule is otherwise in real estate. There are always pork bellies or shares of DuPont available in the markets to cover an agreement to sell a given quantity on a future date. Real estate, on the other hand, generally has the quality of uniqueness, and hence the ability to obtain specific performance of a contract for the sale of land. See *Olszewski* v. *Sardynski*, 316 Mass. 715, 717-718 (1944); *Greenfield Country Estates Tenants Assn., Inc.* v. *Deep*, 423 Mass. 81, 88 (1996); 11 Williston, Contracts § 1418A, at 664 (3d ed. 1968). Yet it is unremarkable to contract to sell on a date certain a machine that requires a component that is unique, and which the vendor does not control at the time of contracting.

It is not unusual, particularly in real estate transactions, to condition the promise of performance upon the occurrence of a condition, e.g., that mortgage financing be obtained or that some land use permit be obtained from public authorities. See *Charles River Park, Inc.* v. *Boston Redev. Authy.*, 28 Mass.

App. Ct. 795, 803-804 (1990); *Churgin* v. *Hobbie*, 39 Mass. App. Ct. 302, 303-307 (1995); 14 Powell, Real Property par. 881[6][e][iv][A] (Rohan ed. 1998). Nor is it remarkable to agree to lease a store or building yet to be built, and such an agreement is enforceable. See *In re Wonderfair Stores, Inc., of Arizona*, 511 F.2d 1206, 1210-1211 (9th Cir. 1975); *Newport Terminals, Inc.* v. *Sunset Terminals, Inc.*, 279 Or. 93, 97-99 (1977). See generally 1 American Law of Property § 3.17 (Casner ed. 1952); 2 Powell, Real Property § 16.02[4] (Rohan ed. 1998). "Rules of contract must not preclude parties from binding themselves in the face of uncertainty." *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 518 (1998).

One would not expect third parties whose action may determine whether the primary contracting parties proceed to buy, sell, or lease to become signatories to the primary contract in order to make the primary contract valid. We consider as an antecedent question whether the basic terms agreement should be read as containing a condition that Rizika own, or have under written agreement to buy, the property at 600 Memorial Drive.

In order for performance to depend on the occurrence of a condition, the condition must be expressed, unless a court implies the existence of the condition from the circumstances of the contract. *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 45-46 (1991). *Wood* v. *Roy Lapidus, Inc.*, 10 Mass. App. Ct. 761, 763 n.5 (1980). 5 Williston, Contracts §§ 668-669 (3d ed. 1961). The basic terms agreement between Rizika and Donovan contained no express condition that if Rizika did not obtain title to 600 Memorial Drive, he was relieved of his obligations, and the question arises whether we must find that condition implied of necessity. Such an implication may arise "if the intent of the parties to create one is clearly manifested in the contract as a whole." *Massachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. at 46. It is not clear from the history of the negotiations that the parties intended that Rizika would be free from liability were he not able to deliver on his obligations under the basic terms agreement. Rizika, it is apparent from the record, was a sophisticated and resourceful real estate man who, before signing the basic terms agreement, had made inquiries about the possibilities of the exchange he desired to make with MIT and was prepared to enter into an agreement with Donovan that assumed the risk

that the series of transactions would come off as planned. Indeed, nothing in the record suggests that Rizika would have failed, but for Donovan's repudiation. Donovan cannot leverage his repudiation into a failure by Rizika to supply an essential element of the over-all transaction, i.e., control of 600 Memorial Drive. Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 470 (1991); *Hammond* v. *T. J. Little & Co.*, 82 F.3d 1166, 1178 (1st Cir. 1996); Restatement (Second) of Contracts § 253 (1981). Contrast *Kanavos* v. *Hancock Bank & Trust Co.*, 395 Mass. 199, 202-203 (1985).

As we view them in the light of the circumstances, the written and signed basic terms agreement and Rizika's understanding with MIT (not reduced to writing) were separate contracts and, therefore, the basic terms agreement is not unenforceable because of noncompliance with the Statute of Frauds.

*Damages.* The jury, it will be recalled, returned a damages award of $4,844,912. Rizika had testified to damages of $9,054,636.[7] He arrived at that figure by adding up the rent specified for each of the first five years ($750,000) and the rent for the second five years of the initial ten-year term, adjusted by the agreed upon consumer price index escalator.[8] The rent was net of taxes, insurance, and operating expenses. Rizika could, therefore, with a straight face, say that the $9,054,636 was actually cash in his pocket.

In the memorandum of decision in which the trial judge articulated his reasons for allowing the motion for judgment notwithstanding the verdict, the judge went on to say that, should an appellate court conclude that he had been mistaken on that score, he rejected the jury's damage award. Rizika's figure of $9,054,636 was flawed, the judge said, because it did not take into account considerations of present value, i.e., what amount received at the time of judgment would produce $9,054,636 at the end of ten years. See, e.g., *Welch* v. *Keene Corp.*, 31 Mass. App. Ct. 157, 167 (1991). The judge chose the damage figure, $271,754, testified to by the defendants' expert, an accountant. The accountant had testified to a discount factor of 7.5% for calculating present value. As to other assumptions

---

[7]Rizika was an experienced real estate investor and operator. His qualifications to testify about the economic consequences of the transactions described to the jury were not placed in question.

[8]Application of the consumer price index escalator required Rizika to make certain projections about what price rises over time would be.

made by the accountant, one could understand that the jury would find them esoteric while Rizika's were comprehensible. If the jury applied the accountant's discount figure, or a close approximation of it, the end result would not be all that far off from the $4,844,912 with which they came in. The jury's verdict had a solid basis in the evidence. See *Whitcomb* v. *Hearst Corp.*, 329 Mass. 193, 203-204 (1952); *Solimene* v. *B. Grauel & Co., KG*, 399 Mass. 790, 803 (1987).

The judgment is reversed. A judgment shall be entered reinstating the jury's verdict.

*So ordered.*